To retain the mastership of inter vivos transfers and yet to steer a safe course just off the legislatorial shoals of inheritance taxation demands in these days a very high degree of foresight, circumspection, and skill. Many have explored, few have discovered the direction. Modern legislation and its interpretation have shifted considerable alluvium into the channels of avoidance of either income or death taxes. *Page 534 
Mr. Jay Ten Eyck, an experienced lawyer and banker, who died testate on October 21st, 1943, a resident of Maplewood, Essex County, New Jersey, at the age of 78 years, 11 months, was evidently one of the many to whom the neoteric fusillade of taxes was exceedingly vexatious. They always smote him, it is said, in a tender spot.
The decedent left an acknowledged estate of approximately $238,000, but the taxing authorities have resolved to levy a transfer inheritance tax on certain inter vivos transfers made by him in 1926, 1937, and 1941 in conformity with their conclusion that the specified transfers were made by the decedent either in contemplation of death or were intended by him to take effect in possession or enjoyment at or after his death. R.S.54:34-1 et seq.; N.J.S.A. 54:34-1 et seq; Squier v. Martin,131 N.J. Eq. 263; 24 Atl. Rep. 2d 865. The executrix of the decedent's estate challenges the legal propriety of those assessments by this appeal. R.S. 54:34-13; N.J.S.A. 54:34-13.
In tax appeals of this character the periphery of attack, defense, and inquiry is customarily wide. It often encompasses the personal qualities of the transferor, his habits and propensities, his age and state of health at the time, the sociological and economic factors that impinged upon him, the pertinent circumstances amid which he was situated, his conduct both prior and subsequent to the transfers, the intrinsicalities of his inter vivos gifts, the fashion of his former and ultimate testamentary dispositions of his estate, which subjects comprise some but indeed not all of the sources of radiant information. Dommerich v. Kelly, 132 N.J. Eq. 220;27 Atl. Rep. 2d 871; affirmed, 130 N.J. Law 542; 33 Atl. Rep.
2d 893; affirmed, 132 N.J. Law 141; 39 Atl. Rep. 2d30.
Therefore the story of each such case is normally a lengthy one, and the field of argumentation is correspondingly extensive, rendering it sometimes difficult to tune out the static. But, as in most cases, it is by the back and forth of controversy that we achieve that capacity for critical analysis which leads to a basis of decision. *Page 535 
And then, too, I have learned that one must penetrate beneath the superficial aspects of the transactions. One must have a curiosity about the psychological emotions of the decedent. Such an inquisition will usually expose the incentive, sometimes a tantalizing one, which has induced the person to gravitate toward a distinctive volition of action in his financial affairs.
In the present case it is frankly acknowledged that the periods at which income taxes became payable were painful and infelicitous occasions for this decedent. An oppugnancy to tax exactions, sometimes little less than phobic in intensity, has frequently impelled astute individuals of substantial resources to hatch some particular policy of conduct in the manipulation of their assets and thereby in some degree alleviate their discomfort. An examination of the manipulations makes perceptible the selected policy. This decedent had a plan and pursued it.
I shall not enlarge this memorandum to make room for a recitation in detail of all of the revelations embodied in the transcript of the evidence. It will suffice to disclose the decedent's plan, the type of his transfers, his indubitable motive, and the conclusion to which I am ultimately conducted.
In 1926 the decedent was irked by the obligation to pay income imposts upon that portion of his earnings which he annually donated to his son and daughter for their spending money. Both son and daughter were then adults. He concocted a nostrum. He calculated the amount of such yearly donations and figured thequantum of securities in his portfolio that would annually yield a like amount. In conformity with his computations, he transferred to his wife in trust two funds of $16,000 each with instructions to pay the income from one to the son and from the other to his daughter. He did not then regard it necessary to prepare trust indentures evidencing with precision the terms of the trusts, but from the notations in his account book and from his oral declarations it is evident that he intended to retain a material control over the disposition of the corpus of each trust. Future allowances to his children ceased through his method of substitution. His personal income was thereby lessened. *Page 536 
Assuredly those transfers were not in origin motivated by contemplation of death, but had they subsisted unaltered in their original terms until the death of the decedent with no provision for the disposition of corpus over upon the death of the beneficiary after the settlor and with the possibility of reverter, they would have been subject to taxation. R.S.54:34-1, c; N.J.S.A. 54:34-1, c; Commissioner of InternalRevenue v. Estate of Field, 324 U.S. 113. In passing on to the discussion of succeeding events, it may well be noted that a possibility of reverter, continued to survive in the intervening 1931 trust indenture.
In these cases it is uniformly emphasized by the appellant that at the time of the alleged taxable transfers the transferor was in full bloom, bursting with vigor, sound in wind and limb, and hearty as a buck. This decedent was undoubtedly blessed with sound health, but as the years drop away there is normally some drain on the human stamina. In 1936, having exceeded in age the biblical span of three score years and ten, the decedent suffered an attack of apoplexy which impaired the nerve motility of his mental organism manifestly in the use of his right arm and hand. In an inquiry of our present purpose, such a casualty is infused with major significance because to suppose that a person falling a prey to such an alarming affliction would not indulge some thought of approaching dissolution would be a grotesque fantasy. The decedent thereupon relinquished his duties as counsel for the Mutual Benefit Life Insurance Company in Newark. The view backward began to encompass a greater area on his tableau of accomplishments than did his forward prospect.
While thus afflicted the decedent on February 5th, 1937, transferred his title to his residential real estate at Maplewood through an emissary to himself and his wife as tenants by the entirety and on July 28th, 1937, he executed an amended trust indenture in which he renounced all his reversionary interests in the trusts previously established for the beneficial advantage of his son and daughter. It was not until the arrival of that refluent season of his life that the decedent *Page 537 
resolved to convert even apparently the last-mentioned transfers into absolute and unqualified gifts.
Life, however, continued to be kind to Mr. Ten Eyck and his health improved, but in 1941 he forsook all business engagements, and in that year he transferred in the fashion of an outright gift certain of his securities of an approximate value of $44,000 to his wife. It is of some fleeting interest to notice that at that time under the provisions of the Internal Revenue Code allowing an exemption of $40,000 and the additional annual exclusion of $4,000, his donation just eluded the clutch of a gift tax. Incidentally, a reduction in the amount of the exemption was then being agitated and the exemption was in fact lowered to $30,000 the following year. The decedent was perspicacious.
Here again he followed his plan. It had been his practice to make a monthly monetary allowance to his wife. Upon the consummation of the transfer he calculated on a monthly basis the amount of income his wife would derive from the securities comprising the gift, and he thereafter deducted a like amount from his monthly allowance to her. He pursued that course until his death.
The significance of that practice cannot be ignored. The decedent was a person of nimble intelligence and particularly educated in the law. Can it be reasonably supposed that he had not predetermined that in its pragmatical effect his chosen practice constituted a reservation for his own use of the income of his apparent donations? The retention by a transferor of the income and actual beneficial enjoyment of the fund for his life is an impressive and noteworthy circumstance. Hartford v.Martin, 122 N.J. Eq. 489; 194 Atl. Rep. 800; affirmed,120 N.J. Law 564; 1 Atl. Rep. 2d 13; affirmed,122 N.J. Law 283; 4 Atl. Rep. 2d 31; Bank of New York v. Kelly,135 N.J. Eq. 418; 38 Atl. Rep. 2d 899; Avery v. Walsh,138 N.J. Eq. 80; 46 Atl. Rep. 2d 912.
Certainly the inference is inescapable that the decedent was vigilantly watching the shoals of income, gift, and inheritance taxes, meanwhile retaining some lien on the bill of lading. *Page 538 
I found reason to remark in Avery v. Walsh, supra (at p.88): "Perplexity in the solution of these tax disputes is increased because they so often originate from what is intrinsically and tacitly a family arrangement." That comment has its relevancy to the case at bar. Abstraction is difficult because the events to be dealt with are so closely interwoven with the affectionate and confidential relationships and with the hopes and fears of everyday life. In all the transfers here under scrutiny, all of the participants — videlicet, the trustee, thecestui que trust, the surviving tenant by the entirety, and the last donee — were members of the decedent's immediate family and the natural objects of his bounty. Note the testamentary disposition of his estate.
The collection and examination of the pinfeathers of the evidence are sometimes serviceable in quest of the probabilities. The decedent's lifetime gifts appear to have been exceedingly provident. He transplanted income in substitution for his normal allowances to his wife and children. The transactions are transparent. The voluntary alteration of the title to the residential property is equally pellucid. It was accomplished at the one "sitting." The deeds were never recorded. They were deposited in a "tin box" utilized at home by both the decedent and his wife. The decedent continued to pay the taxes assessed against the premises.
A neutral study of all of the circumstances of the present case ushers me to certain factual conclusions which I shall summarily express. The two trusts created in 1926 were not at origin motivated by any contemplation of death. Neither was it the intention of the decedent thereby to effectuate an absolute, unconditional, and irrevocable gift of the corpus of either trust. This decedent, from aught that is apparent, was by no means pre-eminent in his generosity. Until a consciousness of the eventide of his life enveloped his mind, he never let go of any of his gifts without some advantage sticking to his fingers. In 1936 he was stricken with an apoplectic hemorrhage in the brain. An adversity of that character is naturally alarming. The decedent was too intelligent to depreciate its importable premonitions. Some conjectures *Page 539 
and divinations of a recurrent attack, bodily and perhaps mental disability, and a more closely approaching fatal dissolution must indubitably have crowded their way into his contemplations of his future. Those introspections alerted his tax-conscious mind. For example, he knew that he could devise his residential property to his wife, yet as a lawyer he was aware that if he qualified her as a tenant by the entirety, he would preserve for life his own right of possession and that upon his death she would pocket the property by operation of law, and thus remove from his taxable estate an asset of the value of $14,000. He chose to pursue the latter course.
I am persuaded that his contemplations in 1936 and 1937, which were generated by his attack of apoplexy and his advancing age, induced him to surrender his reversionary interests in the trusts theretofore established for his son and daughter. He knew that unless he took that action the transfers as constituted would be taxable. He felt constrained to accept what he supposed might be an eligible opportunity to rescue them from taxation. The prospect of approaching death caused him to make the transfer of 1941 to his wife. It was nevertheless expected and intended by the decedent that the substance of all of his transfers should be guarded and preserved to subserve his design and purpose until his death. Such was done. Often action thus voluntarily perpetuated speaks loudly.
The criterion is whether the transferor was predominantly impelled to make his transfers by a contemplation of an apprehended approach of death or whether in another aspect of his conduct, he intended that his transfers should in harmony with his predetermined purpose become and only become effective in the possession and enjoyment of his designated beneficiaries at and after his demise.
If my inferences and deductions from the evidence, direct and circumstantial, are rational, then it follows that the transfers of the decedent to his son and daughter, and the transfer of securities to his wife in 1941 are subject to the transfer inheritance tax assessments. *Page 540 
Whether the transfer by the decedent through a third party of his title to his residential property to himself and his wife as tenants by the entirety is exposed to transfer inheritance taxation under our existing legislation as it has been in practice heretofore interpreted arouses some incertitude.
I have ascribed significance to the occurrence of that transaction itself because it is a circumstance in some measure indicative of the decedent's state of mind at that time. It, like all acts of the decedent, is searched not to ascertain the lawfulness of what he did, but to uncover his true and genuine intention in the light of what he did. The basic question nevertheless lingers. Is that transmutation of title a taxable transfer?
The taxing authorities have with recognizable reason uniformly construed subsection 5 of section 1, chapter 228, P.L. 1909, even as amended by chapter 172 of P.L. 1922 (now R.S. 54:34-1,f; N.J.S.A. 54:34-1, f) as applying exclusively to joint tenancies and not to tenancies by the entirety. The intimation of a different or contrary statutory construction discoverable in the case entitled In re O'Neill, 111 N.J. Eq. 378, 381;162 Atl. Rep. 425, has been characterized by the tax department asobiter dicta. Inheritance Taxation in New Jersey, Forms-Letters3259; see, also, pp. 383, 3238. Moreover the tax department has not interpreted the comment of the Vice-Ordinary, In reHuggins, 96 N.J. Eq. 275; 125 Atl. Rep. 27; affirmed, sub nom.Fairleigh v. Bugbee, 3 N.J. Mis. R. 1072; 130 Atl. Rep. 923;
affirmed, 103 N.J. Law 182; 134 Atl. Rep. 917, as authority for the taxation of tenancies by the entirety regardless of whether they were created by the decedent or another.
Our legislative policy has in most particulars been generous and favorable to tenancies by the entirety, and consequently the absence of some specific enactment and the attitude of the tax department have created the universal impression that under existing law such tenancies are not liable to transfer taxes.
The present question can be rendered more complex if one envisions a case where the husband in extremis owning real *Page 541 
estate of the value of half a million dollars, a few days before his death transformed through the agency of an intermediary the title of all of it into one by the entirety.
However, if there is a gap, it is one appropriately to be closed by the legislature. The inherent characteristics of an estate by the entirety cannot be disregarded. Contemplation of eventual death is probably an influential, possibly the predominant reason for the daily organization of such estates. Assuredly it is also intended that the succession of either tenant to full title shall be postponed until the death of one. For me to differentiate and to denote those estates by the entirety which ought to be taxed and those which are exempt would be essentially an indulgence in a legislative rather than a judicial act.
The assessment levied upon the conveyance of the real property will be annulled. *Page 542