6 N.J. Super. 122 (1950)
70 A.2d 187
CHARLES E. McMANUS, JR., ET AL., EXECUTORS, APPELLANTS,
v.
WALTER T. MARGETTS, JR., TREASURER, ACTING AS DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF TREASURY, STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 1949.
Decided January 9, 1950.
*123 Before Judges McGEEHAN, COLIE and EASTWOOD.
Mr. Robert V. Carton argued the cause for the appellants (Messrs. Durand, Ivins & Carton, attorneys).
Mr. William A. Moore argued the cause for the respondent (Mr. Theodore D. Parsons, Attorney General, attorney).
The opinion of the court was delivered by EASTWOOD, J.A.D.
Appellants, Charles E. McManus, Jr., et al., executors, estate of Charles E. McManus, deceased, seek a reversal of an assessment made by the Department of Taxation and Finance, Transfer Inheritance Bureau, on transfers made by decedent between December 29, 1941, and his death on June 3, 1946, at the age of sixty-five.
The sole question for determination is whether or not the transfers under review were made in contemplation of death or intended to take effect in possession or enjoyment after his death.
In an effort to facilitate a clearer insight into the intent of the grantor at the time he made the transfers, we deem it essential to recount the development of the decedent's business ventures and the circumstances surrounding the transfers.
*124 Between the years 1912-1920, the decedent and his wife, Eva McManus, became interested in and worked together experimenting and developing new methods for processing of cork, as the result of which they received approximately twenty to twenty-five patents, and established a small factory in New York called the New Process Cork Company. In view of their joint labors, Mr. McManus insisted that his wife share in the business to the extent of one-third of the royalties. In 1921, Mr. McManus organized the CEM Securities Corporation to take title to the royalty contracts and patents which he owned. Mrs. McManus received approximately one-third of the stock and bonds of this corporation. By 1926 the business had become very successful; decedent had acquired the controlling interest in the Crown Cork and Seal Company and became its president.
With his increasing business success, Mr. McManus enjoyed proportionate increases in his income until it reached a point where he was faced with the problem of high income taxes, and retained Mr. Marvin Haynes, a tax expert, to advise and counsel him in devising a solution thereof. Mr. Haynes recommended the creation of a trust and prepared a proposed trust agreement whereby Mr. McManus' property would be divided into five parts: one part for Mrs. McManus, one for each of their children and one for the decedent. Under that plan Mr. McManus was to retain a life estate in his property, which on his death was to go to his children, each of whom was to receive the income from his share until he reached the age of thirty-five, when he would receive the principal. Mrs. McManus was to receive the income from her share for life and upon her death her share would go to her children. Mr. McManus rejected this plan. So that he might observe the development of their business interests and capabilities and the effect of such transfers upon them, on December 29, 1930, he executed three trust agreements, providing for periodic transfers of stock of the CEM Securities Corporation to his sons. In making these transfers, Mr. McManus took full cognizance of the prevailing income tax rates and adjusted the size of his transfers accordingly. The CEM Securities *125 Corporation declared dividends which were distributed to the record owners of stock after transfers thereof had been made under the terms of the trust agreements.
In furtherance of his long range plan of transfers and reduction of his taxable income, the CEM Securities Corporation was reorganized in 1931, and new preferred non-voting stock was issued for the old shares of common stock and a new issue of common stock of the reorganized corporation was taken by Mr. McManus. No dividends were to be paid on this common stock. Thus Mr. McManus retained control of the business, but reduced his taxable income.
In the years that followed, Mr. McManus made further equal and absolute transfers of his property to his wife and children, giving a portion thereof to his business associates and members of their families who had been with him through those years in which he ascended the ladder of success. Consequently, by December 29, 1941, a large proportion of his property had been given away. It is enlightening to review decedent's transfers over the years, as they emphasize the execution of decedent's plan or program for the transfers. They may be summarized as follows. In 1921, at the age of forty, he made transfers of $800,000. By 1930, at the age of forty-nine, he had transferred $1,250,000. In 1932, his transfers had amounted to $1,685,000, and by 1934, at the age of fifty-three, they had reached $1.705,000. Just prior to December 29, 1941, decedent's transfers amounted to $2,328,367.50 and on December 29, 1941, decedent made transfers amounting to $341,773. Between that date and the date of decedent's death, he made transfers amounting to $394,814.50. Of the $1.705,000 total transfers made by decedent between the ages of forty and fifty-three, all but $5,000 went to members of his family. Of the $1,359,955 total transfers made between the age of fifty-four and his death at sixty-five, $693,730 went to members of his family and $666,265 went to persons outside his family.
In 1938, because of an eye condition, Mr. McManus sought medical advice. The doctor in his examination found that decedent had high blood pressure. He prescribed medicine *126 and advised decedent to discontinue working so hard. It is quite evident that the patient failed to take the advice seriously and refused to curtail his activities. In 1940, Mr. McManus suffered a gastric hemorrhage and after treatment apparently enjoyed a remarkable recovery. In April, 1944, the decedent suffered a cerebral hemorrhage and resumed his business activities after a satisfactory recovery. In addition, he was busily engaged in the development of a steel mill which had to be postponed for lack of materials just prior to his death on June 3, 1946.
Decedent, by his will executed June 23, 1943, left $113,000 to his friend John J. Nagle and the remainder of his estate in trust for his wife and family. By codicil dated December 22, 1944, decedent reduced the gift to John J. Nagle to $94,000, but confirmed the aforementioned will in all other respects.
The executors of decedent's estate filed a report with the respondent bureau showing personal assets of $790,149.18 and debts and expenses of $758,866.68, leaving a net estate of $31,282.50. It is noteworthy that a large proportion of the reported liabilities represented a loan in the sum of $225,000, secured by decedent from the CEM Securities Corporation to pay a federal gift tax on transfers he had made. The tax as assessed by the Federal Government greatly exceeded the figure decedent had calculated and paid. This increased tax assessment is presently under appeal. The respondent bureau appraised the assets at $846,399.18, which included the value of all property transferred on and after December 29, 1941, deducting liabilities of $16,625.35, leaving a net estate of $829,773.83.
The appellants contend that the motive of the donor is the controlling factor in determining whether a transfer is made in contemplation of death or intended to take effect in possession and enjoyment at or after death; that the reduction of taxable income was one of the principal motives of the decedent; that decedent's plan was also motivated by love and affection for his wife and family, a desire to encourage and assist his children in the business and in appreciation *127 of the loyalty manifested by his business associates; that the presumption that transfers made by decedent within two years of his death were made in contemplation of death is overcome by the weight of the evidence; that the Director failed to successfully bear the burden of establishing that the transfers in question made prior to the two-year period were in violation of the statute; and that the transfers were in furtherance of a preconceived plan and were not influenced by the decedent's age, state of health or to take effect at death or in contemplation thereof.
The respondent contends that the transfers made on and after December 29, 1941, were in the nature of a testamentary disposition; that his age, his state of health, the fact decedent retained control over CEM Securities Corporation even after making the transfers, that the transfers were made to the natural objects of his bounty, indicate that they were transfers in contemplation of death under R.S. 54:34-1c.
Vice-Ordinary Jayne, speaking for the Prerogative Court in Squier v. Martin, 131 N.J. Eq. 263 (1942), at page 268 said:
"* * * The manifest object of the statute is to tax testamentary and intestate transfers and also inter vivos transfers which are in fact makeshifts employed to effectuate a purpose normally accomplished by will. * * * The statute envelopes all transfers which in reality are substitutes for testamentary dispositions. * * *"
See also Schneider v. Zink, 2 N.J. Super. 53 (App Div. 1949).
It was said in First National Bank and Trust Company v. Zink, 1 N.J. Super. 265 (App. Div. 1949), at page 268:
"The burden of proof of taxability is upon the State but where the gift is made less than two years prior to the donor's decease, a presumption arises that the gift is made in contemplation of death, and the burden is then on the taxpayer to go forward with evidence to rebut the presumption. Cairns v. Martin, 130 N.J. Eq. 313 (Prerog. 1941). In Central Hanover Bank & Trust Co. v. Martin, 129 N.J.L. 127 (E. & A. 1942), it was said `that the test of a gift in contemplation of death in the statutory sense is whether the determinative motive was "of the sort which leads to testamentary *128 disposition." It is requisite that the "thought of death" be the impelling cause of the transfer. If that be a controlling motive inducing the disposition of the property, the transfer is taxable under the statute. * * * The inquiry therefore is whether the gift was essentially testamentary in character. Was it made as a substitute for testamentary disposition? Was the generating thought of death as distinguished from purposes associated with life?'"
The intent of the donor being the determinative factor, it is essential to explore the circumstances of each case so that it may be determined what dominant controlling or impelling influence motivated the donor in making the transfers. Barillet v. Kelly, 131 N.J.L. 140 (Sup. Ct. 1944); Schneider v. Zink, supra. Inquiry into the state of mind of the decedent as evidenced by his actions and the facts and circumstances surrounding the transfers in question, convinces this court that they were not "substitutes and makeshifts purposefully employed to effectuate in essence a testamentary disposition." One must look at the entire picture of the early struggles and success of Mr. McManus to fully appreciate the significance of his transactions. The solid foundation of decedent's business success was the direct result of those early years when he and his wife toiled arduously and persistently together. Decedent justly and fairly determined that his wife should share the fruits of their joint labors by allocating to her a portion of the patent royalties and, as his success became greater, that she should receive a share of the ownership of the CEM Securities Corporation. When his children became of the age to comprehend and appreciate the business their parents had established, Mr. McManus prudently and purposefully gave his children stock and bonds as they demonstrated their interest and capabilities  all the while subjecting them to his careful scrutiny. Co-existent with this plan of business education and appreciation of responsibility of his children, was Mr. McManus' effort to reduce his taxable income which was then increasing in face of steadily higher tax rates. In 1930, he reorganized the CEM Securities Corporation giving the dividend-producing stock to his wife, family and business associates and retained the "no dividend" stock for himself. The record indicates a continuous and *129 systematic disposition of his holdings over the years of his rising affluence varying hardly at all from the first years to the year of his death. Not only did he plan that his wife and family share in his gains but he insisted upon rewarding his business associates and their families for their loyalty and assistance in attaining success.
During the period of time in question, we find the medical record indicates a series of illnesses and apparent recoveries, commencing in 1938 and continuing periodically and increasing in severity to his death in 1946. He received many warnings from the doctor to reduce his business activities for the sake of his health, but the record is persuasive that his physical recoveries convinced him, at least, that he did not suffer from any basic impaired physical condition. He made numerous business trips about this country and the world during the period in question and busily engaged himself in developing greater business even to the extent of planning a new steel mill. It is apparent that decedent gave little regard for his physical condition and can scarcely be said to have been premonitorily conscious of impending doom, rather his only thought and course of action seems to have been with the object of living.
The Director places great emphasis upon the age of the decedent at the time of the transfers in question, as an evidence that they were made in contemplation of death. The courts of this State have repeatedly held that age is but one of the factors to be considered in determining the taxability of a transfer under R.S. 54:34-1c. Provident Trust Co. of Philadelphia v. Margetts, 5 N.J. Super. 420, 69 A.2d 352 (App. Div. 1949).
It is the opinion of this court that the preponderance of the proofs warrant the finding that decedent's transfers on and after December 29, 1941, were but the continuation of a well devised plan of sharing his business and financial success with his wife, family and business associates and a reduction of his taxable income, motivated by a great sense of love and affections for his family, his friends and his business. It was all part of a carefully conceived plan inaugurated in *130 the early days of his success and followed with the precision of the scientist who was making his gifts as the interests and capabilities of his children warranted and as the increased tax rate demanded. We find that these transfers were absolute, unconditional and consummate gifts intended by the transferor to be immediate in possession and enjoyment by the transferees during the life of the transferor and were made by one motivated by thoughts of living and not in contemplation of death. Central Hanover Bank & Trust Co. v. Martin, 129 N.J.L. 127 (E. & A. 1942).
The assessment is set aside and the judgment of the Director reversed.