CRABTREE, J.T.C.
This is a transfer inheritance tax case wherein plaintiff seeks review of a deficiency assessment made by defendant in the *131 amount of $109,757.41, including interest calculated to October 20, 1993. The deficiency arises from two audit adjustments:
1. Three inter vivos transfers in trust made by the decedent, Emily Ellen, on September 2, 1989, in the aggregate amount of $612,656, which defendant determined were made in contemplation of death within the purview of N.J.SA 54:34 — 1(c);
2. An increase in the date-of-death value of decedent’s residence from $165,000, as reported, to $182,800.
In addition, plaintiff alleges that the estate is entitled to a credit for inheritance tax paid by the estate of decedent’s brother, Max Pentel, who died testate on May 15, 1989, two and one-half years prior to the decedent, leaving his entire estate to her.
Emily Ellen died testate at the age of 93, on November 25,1991, a resident of West New York, New Jersey. Her gross estate, including the disputed inter vivos transfers, was valued at $2,044,-881. The date-of-death value of the assets involved in the disputed inter vivos transfers was $612,656, or 29.96% of decedent’s gross estate.
The subject of the transfers was publicly traded securities, and the objects of decedent’s benefactions were her niece, Phyllis Charny, and her grandnieces, Anna and Rena Charny, Phyllis’s twin daughters. The transfers were all in the form of trust agreements. The Phyllis Charny Trust called for the payment of income to Phyllis for her life, with the remainder to Anna and Rena in equal shares. The term of each trust for the grandnieces was four years and one month, with income payable to the beneficiary (Anna or Rena) and the remainder to the Phyllis Charny Trust. The values of the assets transferred to the trusts were as follows:
Phyllis Charny Trust — $504,728
Anna Charny Trust — $48,254
Rena Charny Trust — $59,674
Decedent’s will, also executed on September 2, 1989, left her entire residuary estate in trust, with the entire net income there *132 from payable to Phyllis, with the corpus distributable upon the latter’s death to Anna and Rena in equal shares.
Emily Ellen maintained close'and loving relationships with her family. Her sister, Harriet, had lived next door to Emily for many years. Phyllis was Harriet’s daughter; Anna and Rena were Phyllis’s daughters, as stated above. Because Emily married relatively late in life and had no children of her own, she regarded Phyllis as a daughter and Anna and Rena as granddaughters.
Phyllis, who lived from birth at 6100 Highland Place, West New York, New Jersey, next door to her aunt, Emily, moved to Israel after attending the University of Rochester. Emily visited Phyllis and the twins in Israel three or four times between 1973 and 1984. Anna and Rena served in the Israeli army in 1983 and 1984, following which, they came to the United States to pursue their formal educations, Anna at the University of Pennsylvania and Rena at Bryn Mawr. At that juncture, Phyllis was separated from her husband and was the sole support of her daughters. Phyllis’s annual income was no more than $19,000. The total tuition, room and board for the girls was about $30,000 per year. Phyllis and her daughters relied heavily upon scholarships, government loans and financial support from Emily.
Emily frequently expressed concern for her grandnieces, of whom she was not only fond but also proud.
Emily created the trusts for Anna and Rena in 1989 to assist them in pursuing graduate studies. Anna graduated from the University of Pennsylvania and currently matriculates at Hebrew University in Jerusalem, where she also works as a teaching assistant in biology. Rena also returned to Israel, after graduating from Bryn Mawr, and attended law school at Tel Aviv University. She is now an attorney.
The twins’ postgraduate matriculations were financed by the trusts Emily created for them on September 2, 1989.
According to the testimony of plaintiffs witnesses, Emily appeared to be in robust health, remarkably so for a person of her *133 advanced years. She did her own grocery shopping and her own cleaning; she declined household help. According to Phyllis, Emily was completely independent, insisting that she do everything for herself, even when she was 90-years old. Phyllis also testified that to her knowledge, Emily was not hospitalized during the last four years of her life, except for her last illness, which lasted five or six days.
Emily’s death certificate recites the immediate cause of death as cardiopulmonary arrest and the underlying cause as atherosclerotic heart disease, a condition which existed for five years prior to her demise, on November 25, 1991, according to the death certificate.
The assets for the three trusts Emily created on September 2, 1989 came directly from the estate of her brother, Max Pentel. The assets were transferred to the trusts from trading accounts maintained in Max’s name.
The relevant statute, N.J.S.A. 54:34-1, provides, in pertinent part:
Except as provided in Section 54:34-4 of this Title, a tax shall be and is hereby imposed ... upon the transfer of property, real or personal, of the value of $500.00 or over, or of any interest therein or income therefrom, in trust or otherwise, to or for the use of any transferee, distributee or beneficiary in the following eases:
c. Where real or tangible personal property within this State of a resident of this State or intangible personal property wherever situate of a resident of this State or real or tangible personal property within this State of a non-resident, is transferred by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor, vendor or donor, or intended to take effect in possession or enjoyment at or after such death.
A transfer by deed, grant, bargain, sale or gift made without adequate valuable consideration and within 3 years prior to the death of the grantor, vendor or donor of a material part of his estate or in the nature of a final disposition or distribution thereof, shall, in the absence of proof to the contrary, be deemed to have been made in contemplation of death within the meaning of paragraph “c” of this section; but no such transfer made prior to such 3-year period shall be deemed or held to have been made in contemplation of death.
The statute creates a presumption that a gift made within three years of the donor’s death of a material part of his *134 estate is a transfer in contemplation of death. To rebut this presumption, the taxpayer must prove by a preponderance of the evidence that the gift was not so made. Swain v. Neeld, 28 N.J. 60, 65, 145 A.2d 320 (1958); In re Estate of Anne Boyd Lichtenstein, 52 N.J. 553, 567, 247 A.2d 320 (1968). Irrespective of the existence of any life-associated motives, it is sufficient to create a gift in contemplation of death if an impelling motive exists to make a present disposition in lieu of a testamentary disposition. In re Estate of Anne Boyd Lichtenstein, supra, 52 N.J. at 569, 247 A.2d 320. Whether a donative transfer is a testamentary substitute depends upon the donor’s subjective state of mind at the time of the transfer, and that state of mind is a question of fact as to which'the taxpayer has the burden of persuasion, to be ascertained by reconstruction by means of objective indicia. Ibid.
Relevant factors to be considered include the age and general health of the donor at the time of the gift; the time interval between the inter vivos transfer and death; whether or not the inter vivos transfer was part of a testamentary scheme or plan; and whether or not the gift was made to the natural objects of the donor’s bounty. Swain supra, 28 N.J. at 70, 145 A.2d 320. A purpose to avoid death taxes, while perhaps relevant, is not a sine qua non of taxability. Id. at 69, 145 A.2d 320. By the same token, the thought of imminent death, or the absence of such thought, is not material; what matters is whether the transfer was a substitute for testamentary disposition. In re Estate of Anne Boyd Lichtenstein supra, 52 N.J. at 567-568, 247 A.2d 320.
In this case, the inter vivos transfers to Phyllis and the grandnieces constituted nearly 30% of Emily’s gross estate, which, under the decided cases, represents a material part of her estate. See, e.g., Maguire Estate v. Taxation Div. Director, 9 N.J.Tax 437 (Tax 1987). Moreover, all three transfers are aggregated in determining whether they constitute a material part of the estate. Id. at 443.
In applying the tests of Swain to the facts of this case, the evidence clearly shows that the decedent was within two weeks of *135 her 91st birthday when the three trusts were created; she was afflicted with a serious heart condition at that time, notwithstanding the testimony of plaintiffs witnesses as to her good health. Emily died a little more than two years after the gifts. The gifts were part of a testamentary plan, as evidenced by the fact that the inter vivos dispositions were identical to the dispositions made in her will, and the gifts in trust were made to the natural objects of her bounty, as demonstrated not only by the proofs of the close and loving relationships between the decedent and her niece and grandnieces, but by the terms of her will as well.
Plaintiff argues that the trusts for the grandnieces were clearly life-motivated as they were of short duration and were intended to assist the income beneficiaries with their educations. The governing law, however, as reflected in both Swain and Lichtenstein, is that irrespective of any life-associated motives, it is sufficient to create a gift in contemplation of death if an impelling motive exists to make a present disposition in lieu of a testamentary disposition.
In this connection, the Lichtenstein case is instructive. There, the decedent, in an effort to save her daughter’s marriage, created a trust with income payable to her son-in-law for life, with the principal payable at his death to the settlor’s daughter’s issue then living, in equal shares. 52 N.J. at 565, 247 A.2d 320. The son-in-law was permitted to borrow up to $100,000 from the trust corpus in any one calendar year. Ibid
The disparity in income between the son-in-law and decedent’s daughter had led to marital discord, and the trust was designed to reduce that disparity and ameliorate the discord. Id. at 571-72, 247 A.2d 320. The son-in-law had sought an outright gift of income-producing securities, but the decedent chose the trust instead. Id. at 573-74, 247 A.2d 320.
In holding that the trust corpus was taxable as a transfer in contemplation of death, the court said:
In this evidentiary complex, we seek, as the court did in Swain v. Neeld, supra (28 N.J. 60 [145 A.2d 320]), the dispositive fact or facts determinative of whether an impelling post mortem motive or intent existed in the settlor’s mind with *136 respect to the transfer which was made. Had it taken the form of the outright gift first sought, the case would be a much more difficult one for taxability from the contemplation of death standpoint for the emphasis would have primarily been on the life associated motive of making a large amount of capital immediately and fully available for the use of the transferee, as well as furnishing income both presently and in the "future.
While the taxability of the transfer as it eventuated is not so obvious as to be beyond all debate, there are sufficient indicia to hold it to be so. The deliberate choice of the particular trust format and terms used, for whatever reason the attorney may have advised, changed not only the quality and scope of the gift, but substantially shifted the emphasis to post mortem, aspects. The primary donee’s interest was sharply curtailed. Especially, use of the principal was closely confined (his first borrowing therefrom was not accomplished until 1961 and then only to the extent of $4,500) and it was required to be preserved for ultimate distribution to the transferor’s grandchildren, most probably not to occur until long after the transferor’s demise. While the income interest was retained in the son-in-law, no longer was the amount thereof within his sole control through choice of investments because of the trustees’ obligation to safeguard the remainder interest. All of this smacks essentially of an inter vivos substitute for a testamentary disposition by a settlor close to the end of her days seeking to preserve her daughter’s marriage indefinitely. Under all the circumstances, it was the kind of disposition which, except for income for the balance of the settlor’s life, could as well have been made by will or codicil. So it cannot be said with assurance that the after death purpose was not at least one of the impelling motives in her mind for the form the transfer took. It is enough for taxability that the distinct probability of such an actuating motive reasonably persists.... [at]
[In re Estate of Anne Boyd Lichtenstein, supra, 52 N.J. at 574-75, 247 A.2d 320]
In the case sub judice, the decedent’s grandnieces were the income beneficiaries of trusts created to assist them with their education, a life-associated motive. However, upon the termination of the trusts, the principal thereof was payable to the trust created for the benefit of the decedent’s niece, a disposition with a palpable post mortem aspect. Like the trust for the son-in-law in Lichtenstein, such disposition smacked essentially of an inter vivos substitute for a testamentary disposition by a settlor close to the end of her days seeking to benefit those who would long outlive her.
In view of the foregoing, the court concludes that the transfers in trust for the benefit of the decedent’s niece and grandnieces were transfers in contemplation of death within the purview of N.J.S.A 54:34-l(c).
*137 The decedent’s residence, at 6102 Highland Place, in West New York, New Jersey, was valued by plaintiff for inheritance tax purposes at $165,000; defendant determined the value to be $182,800. At the trial, however, defendant’s valuation expert testified to a value of $175,000.
Plaintiffs valuation expert testified to a value of $165,000, a conclusion which he supported with three sales of allegedly comparable properties, all in close proximity to the subject. Those properties all sold in August 1991, three months prior to the decedent’s death, for $150,000, $173,000 and $175,000. The sale properties were all two-family brick residences, as was the subject. The sale properties were all about 60 years old; the subject was about 75 years old at the decedent’s death.
Plaintiffs valuation expert inspected the subject, and from his inspection, he concluded that the property suffered from deferred maintenance. Evidence introduced at the trial showed that the cost of restoring the property to a reasonable condition was approximately $6,000. Plaintiffs expert took these costs into account in his adjustments for the comparable properties and arrived at a value estimate of $165,000.
Defendant’s valuation expert, in developing his value estimate of $175,000, relied upon three sales of allegedly comparable properties, two of which were also utilized by plaintiffs expert. The third comparable relied upon by defendant’s expert involved property at 6039 Highland Place, in West New York, which sold on April 8, 1992, for $190,000.
Defendant’s expert did not inspect the interior of the subject property.
The principal difference between the experts is attributable to deferred maintenance. Plaintiffs expert inspected the property and saw the need for repairs, for which he made an adjustment in the sale prices of the comparables. Defendant’s expert did not inspect the property, and therefore, made no adjustment for its condition.
*138 Inspection of the subject is indispensable when the sales comparison approach is used. WCI-Westinghouse, Inc. v. Edison Tp., 7 N.J. Tax 610, 623 (Tax 1985), aff'd o.b. per curiam 9 N.J. Tax 86 (App.Div.1986). For this reason alone, the opinion of plaintiffs expert is more probative. The evidentiary utility of an expert’s opinion depends upon the facts and reasoning offered in support of it. Dworman v. Tinton Falls Bor., 1 N.J. Tax 445, 458 (Tax 1980), aff'd o.b. per curiam 180 N.J.Super. 366, 3 N.J. Tax 1, 434 A.2d 1134 (App.Div.1981).
Accordingly, I find that the fair market value of the decedent’s residence, on the date of her death, was $165,000.
Finally, plaintiff argues that a credit should have been allowed for the tax attributable to the assets transferred from the estate of Max Pentel to fund the three trusts created by the decedent within three years of her death and which this court has found to be taxable as transfers in contemplation of death within the purview of N.J.S.A. 54:34 — 1(c), as it is “unfair” to tax the same assets twice within some two and one-half years (the interval between the deaths of Max Pentel and the decedent).[1]
The simple answer to plaintiffs argument is that New Jersey law, unlike federal law, does not permit a credit for property previously taxed. The death tax structures of the United States and New Jersey are just not comparable. The federal estate tax imposed upon the estate of Max Pentel was probably around $400,000 after the unified credit but before the credit for state death taxes. The New Jersey transfer inheritance tax, on the other hand, was less than $200,000. The alleged inequity of failing to allow a credit for property previously taxed must be viewed in this light.
*139 The parties will submit a computation pursuant to R. 8:9-3, following which, judgment will be entered.

 Plaintiff claims that, as a matter of equity, the estate is entitled to the same credit for properly previously taxed that is available under the federal estate tax law. That law provides, in Section 2013 of the Internal Revenue Code, that property previously taxed is entitled to a credit when the second decedent dies within ten years after the death of the first decedent. The credit ranges from 20% to 80%, depending upon the number of years elapsed between the first and second deaths.