AXELRAD, J.T.C.
This is a transfer inheritance tax case (N.J.S.A., 54:33-1 to 37-8) in which taxpayer seeks review of a final assessment made by the Director of the Division of Taxation (“Director”) in the amount of $33,280, and refund of this amount which it paid in satisfaction of the assessment. The deficiency arises from two inter vivos transfers, one of cash and the other of real estate made on behalf of Hannah Berg (“Hannah” or “decedent”) by her attomey-in-fact, Werner Katzenstein (“Werner”). The Director contends the transfers were made in contemplation of death within the purview of N.J.S.A. 54:34-l(c), and, therefore, are taxable as testamentary dispositions. A second basis for taxing the realty transfer was the reservation of a life estate which delayed possession and enjoyment until Hannah’s death. The transfers in question are as follows:
1. On June 16, 1993, decedent’s house at 41 Vassar Place, Vineland, New Jersey, was transferred to Inge Katzenstein and Jill Pauly, with Hannah retaining a life estate; and
2. On June 25, 1993, cash transfers of Hannah’s bank balances totaling $140,401 were made to Inge Katzenstein and Jill Pauly.
Hannah died testate on March 14, 1995 at the age of eighty-nine. She had been a resident of Seashore Gardens Nursing Home (“Seashore”) in Atlantic City since February 1988. According to her niece, Inge Katzenstein (“Inge”), Hannah was admitted because she was not taking proper care of herself and was becoming increasingly forgetful.
On August 1, 1986, Hannah executed a power of attorney designating Werner as her attorney-in-fact. According to Werner’s testimony, Hannah executed the power of attorney to give him the authority to continue to manage her financial affairs and provide for her support and care, which he believed included the ability to make the disputed transfers. At the time of the *260 transfers, Hannah was not consulted because she was incompetent.[1]
Hannah executed her Last Will and Testament on February 18, 1987, designating Werner as executor of her estate, and executed a codicil on January 25, 1988, which were both admitted to probate. The documents provided for the distribution of her residuary estate as follows:
1) 40% to Inge Katzenstein and Werner Katzenstein
2) 25% to Jill Pauly and Kurt Pauly
3) 10% split among other relatives
4) 25% split among several charities
5) $10,000 to Seashore, provided she was a resident at the facility at the time of
her death.
According to the testimony of Werner and Inge, Hannah maintained a close and loving relationship with her family. After her second husband died on June 1, 1970, she remained in close contact with his nieces, Jill Pauly and Inge, and ate dinner with Inge and Werner every Friday night and holiday until her admission to Seashore. Inge took care of Hannah, as well as her aunt, Sarah Berg, and mother, Klara Berg. Both Inge and Werner held powers of attorney and/or were co-signatories to the bank accounts of all three women. Werner managed the financial affairs of all three women. Sarah Berg was admitted to Seashore in February 1988 and Klara Berg was admitted to Seashore in , September 1991. Even though it entailed driving approximately forty miles each way, Inge visited Hannah and her relatives once a week after their admission to Seashore.
At the time of her admission to Seashore, Hannah’s income was sufficient to cover the costs of the care. Shortly thereafter, however, the nursing home costs increased dramatically. During the same period, the income from her investments declined. Inge and Werner contacted an elder care attorney in 1992, and, upon his advice, the transfers in question were made, as well as similar *261 estate planning transfers for Sarah Berg and Klara Berg. Inge and Werner testified that the transfers for all three women were made in response to rising nursing home care costs and in an attempt to accelerate their qualifying for Medicaid. In addition, Inge acknowledged that an advantage of these transactions was the preservation of property for distribution out of Hannah’s estate.
According to the testimony of taxpayer’s witnesses, Hannah appeared to be in good health for a woman of her advanced age. She led an active social life prior to and during her stay at Seashore. At Seashore, she went out with other residents for refreshments on a regular basis and frequently took long walks. The medical records indicate she suffered from medical conditions typical of a person in her eighties. Her nursing home admission examination revealed early organic brain syndrome, a hiatal hernia, obesity and glaucoma.
According to Inge, Hannah’s condition deteriorated while at Seashore. Over time, she became verbally abusive, began to have difficulty recognizing family members, lost free moving privileges because she wandered off, and reverted to speaking in German, her native tongue. She had a history of heart disease and medical reports dated December 1990 and December 1991 indicate she suffered from cortical atrophy, supraventricular arrhythmias and hypertension. The December 1992 report refers to progressive dementia and confusion. In addition to these annual reports, Hannah’s blood pressure was monitored weekly.
In January 1995, Hannah sustained a fracture of her right femur when she suffered a fall at Seashore and corrective surgery was performed. On March 9, 1995, she was hospitalized due to a persistent fever. Hospital medical records indicated several advanced infections. While in the hospital, she suffered the sudden collapse of her left lung. Hannah died five days later.
The New Jersey Transfer Inheritance Tax Act, N.J.S.A. 54:33-1 et seq., imposes a tax on the transfer of real and personal property from a decedent’s estate, levied upon the transferee. *262 Mueller Estate v. Div. of Taxation, 5 N.J.Tax 642, 648 (Tax 1983). The decedent’s death triggers the tax obligation. The primary objectives of N.J.S.A. 54:34-1 were to place testamentary gifts and those inter vivos transfers that are essentially testamentary in nature into the same succession tax category, to secure equality of taxation and prevent the evasion of taxes. Central Hanover Bank & Trust Co. v. Martin, 129 N.J.L. 127, 127-28, 28 A.2d 174 (E & A 1942), aff'd, 319 U.S. 94, 63 S.Ct. 945, 87 L.Ed. 1282 (1943); Swain v. Neeld, 28 N.J. 60, 68-69, 145 A.2d 320 (1958). Distributions or gifts intending to take affect at or after death, as well as those made in contemplation of death, are considered testamentary dispositions and are taxable under this section. In re Estate of Lichtenstein, 52 N.J. 553, 247 A.2d 320 (1968).
N.J.S.A. 54:34-l(e) imposes a tax on the following inter vivos transfers:
c) Where real or tangible property within this State of a resident of this State ..., is transferred by deed, grant, bargain, sale or gift made in contemplation of death of the grantor, vendor or donor, or intended to take effect in possession or enjoyment at or after such death (emphasis added).
A transfer by deed, grant, bargain, sale or gift made without adequate valuable consideration and within 3 years prior to the death of the grantor, vendor or donor of a material part of his estate or in the nature of a final disposition thereof, shall, in the absence of proof to the contrary, be deemed to have been made in contemplation of death within the meaning of subsection c. of this section; but no such transfer made prior to such three-year period shall be deemed or held to have been made in contemplation of death.
Any inter vivos transfer of property without adequate valuable consideration is a transfer subject to the New Jersey inheritance tax, in those cases where:
the decedent has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death:
1) The possession or enjoyment of the property so that possession or enjoyment of the property can, be obtained only by surviving the transferor; or
2) The right to income from the property____
[N.J.A.C. 18:26-5.8]
The fundamental purpose of the “at or after death” clause is to “preclude avoidance of the transfer inheritance tax by a lifetime transfer which is, in effect, a substitute for or a substantial equivalent of a testate or intestate distribution.” In re Estate of *263 Lingle, 72 N.J. 87, 93, 367 A.2d 878 (1976) (citing In re Estate of Lichtenstein, supra, 52 N.J. at 560, 247 A.2d 320).
Lifetime transfers will be held not to come within the “at or after death” clause where:
(1) the retention of benefits by the grantor is not determined by reference to the duration of his life, ... (2) the grantor has completely divested himself of his entire interest in the transferred property, ... or (3) there was full and adequate consideration for the property transferred____
[Id. at 95, 367 A.2d 878 (citations omitted).]
Courts have repeatedly stated that the transferor’s retention of income generated by a property is a significant circumstance in determining whether the transfer was intended to take effect at or after death. Millar v. Baldwin, Director, Div. of Taxation, 9 N.J.Tax 48, 53 (Tax 1987); Ten Eyck v. Walsh, 139 N.J.Eq. 533, 537, 52 A.2d 445 (Prerog.1947); Bank of New York v. Kelly, 135 N.J.Eq. 418, 420, 38 A.2d 899 (Prerog.1944). Furthermore, inter vivos transfers where the donor retains a life estate in the subject matter transferred have been defined by the courts as transfers “intended to take effect in possession or enjoyment at or after ... death.” Darr v. Kervick, 31 N.J. 476, 483, 158 A.2d 42 (1960) (citing Carter v. Bugbee, 91 N.J.L. 438, 103 A. 818 (Sup.Ct.1918), aff'd, 92 N.J.L. 390, 106 A. 412 (E & A 1919)). Courts consider such transfers to be testamentary by their very nature, because the donors are not regarded as having divested themselves of the property at the time of the transfer, since they retain the right to the enjoyment of the income. Millar, supra, 9 N.J. Tax at 53. The right terminates on the death of the transferor. Id.
On June 16, 1993, Werner, as attorney-in-fact, executed a deed to convey Hannah’s residence at 41 Vassar Place, Vineland, New Jersey. The recorded deed apportioned the realty ownership interest 62% to Inge and 38% to Jill Pauly, with Hannah retaining a life estate. After the transfer Hannah received the net income from the realty.[2]
*264 The subject real estate transaction satisfies all of the aforementioned prerequisites for taxability. First, Hannah retained a life interest in the property and received the rental income generated by the property until her death. She retained an economic benefit in the real property for her lifetime and the transfer of the real estate, i.e., the right to “possession or enjoyment of the property,” was not complete until her death. The life estate reservation implicitly means the grantor’s interest is not totally divested. Second, the transfer was a gift with the stated consideration of $1, which is not full and adequate consideration. Thus, the real estate transfer by its nature was intended to take effect at or after Hannah’s death, and was appropriately taxed.
Approximately nine days after the real estate transaction, Werner transferred Hannah’s bank balances to Jill Pauly and Inge. The cash gifts of $53,347 to Jill Pauly and $87,054 to Inge were absolute and so reported by Werner on the federal gift tax return.
N.J.S.A. 54:34-l(c) creates a statutory presumption that a transfer is in contemplation of death, and is therefore subject to the inheritance tax, if the transfer is without valuable consideration within three years of the death of the transferor, and is a material part of the transferor’s estate or is in the nature of a final disposition or distribution. See also N.J.AC. 18:26-5.7. Once the statutory elements of the “contemplation of death” presumption are satisfied, the taxpayer must prove by a preponderance of the evidence the gift was not made in contemplation of death. Swain, supra, 28 N.J. at 65, 145 A.2d 320; In re Estate of Lichtenstein, supra, 52 N.J. at 553, 247 A.2d 320. To rebut a statutory presumption, the contradicting evidence must be strong enough so that, after its admission, reasonable persons would differ about whether the presumed fact could be found. N.J.R.E. 301(9); Harvey v. Craw, 110 N.J.Super. 68, 73, 264 A.2d 448 (App.Div.), certif. den. 56 N.J. 479, 267 A.2d 61 (1970).
The statute requires that three elements be present to trigger the presumption that inheritance tax liability attaches to the subject inter vivos transfers. As all three elements are present in both the real estate and cash transfers, the Director is entitled to *265 the benefit of the statutory presumption. Taxpayer readily acknowledges the first element, that the realty was transferred for $1 nominal consideration and the cash transfers were absolute gifts with no consideration given by Jill Pauly or Inge, as reported by Werner on decedent’s filed federal gift tax return. The second element is satisfied insofar as the transfers were made twenty-one months before Hannah’s death. It is irrelevant under the law at what point within the statutory window the transfers are made so long as they occur within three years of death. The third element requires a finding that the transfers were either a material part of decedent’s estate or were in the nature of a final disposition.
The disputed transfers constituted nearly the entirety of decedent’s estate. The real estate was reported by taxpayer, and not disputed by the Director, as having a value of $82,900 and the cash transfers totaled $140,401. Decedent’s inheritance tax return reports a gross estate of $5,503.13. Thus, within three years of her death, $223,301 of Hannah’s assets were given away and she was left with a reserved life estate. These transfers represented approximately 97.5% of Hannah’s gross estate, (36.23% in realty and 61.36% in cash), which clearly constituted a material part of her estate. See, e.g. Swain, supra, 28 N.J. at 71, 145 A.2d 320 (one-third of estate represented a material part); Meyerson v. Director. Div. of Taxation, 15 N.J.Tax 128,134 (Tax 1995) (30% of estate constituted a material part); Maguire Estate v. Director, Div. of Taxation, 9 N.J.Tax 437, 446 (Tax 1987) (transfers constituting 17.7% of estate represented a material part); Makris v. Director, Div. of Taxation, 4 N.J.Tax at 139, 144 (Tax 1982) (36.7% of estate constituted material part).
The alternate third element, which requires the transactions to be part of a testamentary disposition, is also present. “A transferor devoid of any thought of escaping inheritance taxes may nonetheless be motivated by a desire to make an essentially testamentary disposition of his property.” Swain, supra, 28 N J. at 69, 145 A.2d 320. Generally, whether a transfer is made as a substitute for or the substantial equivalent of a testamentary distribution depends upon the donor’s state of mind at the time of *266 the transfer. In re Estate of Lichtenstein, supra, 52 N.J. at 569, 247 A.2d 320. This state of mind is “a question of fact as to which the taxpayer has the burden of persuasion, to be ascertained by reconstruction by means of objective indicia.” Meyerson, supra, 15 N.J.Tax at 134 (citing In re Estate of Lichtenstein, supra, 52 N.J. at 569, 247 A.2d 320.)
In order to determine decedent’s intent at the time of the cash transfers, the court must examine the available objective indicia. The factors to be examined in aid of ascertaining the donor’s state of mind include her age and general physical condition, whether the transfers were part of a testamentary scheme or plan, the past history of gifts made by the donor, whether the gifts were made to the natural objects of decedent’s bounty, and whether an emergency situation existed which may have prompted the donation. Swain, supra, 28 N.J. at 70, 145 A.2d 320. Additional factors include the habits and propensities of the donor, the sociological and economic factors impinging upon the donor, the “fashion of his former and ultimate testamentary dispositions of his estate,” his conduct prior to and after the transfers, and the “pertinent circumstances amid which he was situated.” Ten Eyck, supra, 139 N.J.Eq. at 534, 52 A.2d 445.
Decedent was eighty-seven years old at the time of the transfers. The courts have stressed advanced age is only one factor which, standing alone, is not conclusive. See McManus v. Margetts, 6 N.J.Super. 122, 70 A.2d 187 (App.Div.1950); Provident Trust Co. of Philadelphia v. Margetts, 5 N.J.Super. 420, 69 A.2d 352 (App.Div.1949), certif. den. 4 N.J. 127, 71 A.2d 681 (1950). Courts have consistently ruled, however, that transfers made within three years of death by persons over the age of eighty are made in contemplation of death. See Meyerson, supra, 15 N.J.Tax at 128 (trusts created within two weeks of decedent’s ninety-first birthday held to be made in contemplation of death); Swain, supra, 28 N.J. at 71, 145 A.2d 320 (stock transfers made by an eighty-seven year old woman held to be made in contemplation of death); Cairns v. Martin, 130 N.J.Eq. 313, 22 A.2d 415 (Prerog.1941) (cash transfers made by an eighty-three year old *267 man held to be made in contemplation of death), Thus, decedent’s advanced age and transfer of a material part of her estate weigh heavily in favor of including the transfers in her taxable estate.
Further, Hannah was confined to a nursing home at the time the transfers were made. Notwithstanding the testimony of taxpayer’s witnesses that Hannah was in good health for a person her age, the medical records establish that she suffered from numerous ailments, including heart problems, glaucoma and dementia. While the fracture, infection, and collapsed lung which led to her death could not have been anticipated at the time the transfers were made, the physical and mental deterioration, testified to by Inge and Werner and documented in the medical records, was apparent at the time of the transfers. The statutory language does not require that the transfers be made in contemplation of imminent death. In re Estate of Lichtenstein, supra, 52 N.J. at 567-68, 247 A.2d 320.
Hannah had no history of substantial gift giving as indicated by Schedule C[3] of her New Jersey inheritance tax return. Furthermore, the gifts were made to her nieces, who were the natural objects of her bounty, who were also the principal residuary devisees under her will. The assets transferred constituted nearly all of Hannah’s gross estate. As the court noted in Schweinler v. Martin, 117 N.J.Eq. 67, 82, 175 A. 71 (Prerog.1934), aff'd, 13 N.J.Misc. 122, 180 A. 774 (Sup.Ct.1935), it is human nature that people do not generally divest themselves of a major portion of their estates except as a substitute for testamentary disposition and in contemplation of death. Neither Jill Pauly nor Inge was in financial need that may have prompted an immediate beneficial gift.
Further, the inter vivos distribution of cash and real property evidences a conscious effort to track the percentage each niece *268 was to receive from Hannah’s residuary estate under her will, with a devise of 40% to Inge and 25% to Jill Pauly. Thus, between the two beneficiaries, the testamentary allocation would be 62% to Inge[4] and 38% to Jill Paul.[5] Both the realty and cash transfers track these percentages.[6]
Taxpayer contends the intent of Werner, acting as the attorney-in-fact and actual transferor of the property, should govern whether the transfers were made in contemplation of death. Taxpayer asserts that Werner’s “life-associated motive” constitutes “proof to the contrary” under N.J.S.A 54:34-1(c) which is sufficient to rebut the statutory “contemplation of death” presumption. It relies upon the following uncontroverted facts: at the time of the transfers Hannah was incompetent and consequently not consulted, Werner’s motive was to preserve funds for Hannah’s comforts while qualifying her for Medicaid, and the transfers for Hannah and the other two women were made upon the advice of counsel. Nowhere in the statute, nor in the regulation relied upon by the Director, however, does the question of the inclusion in the taxable estate of a transfer made in contemplation of death depend upon the motives of the person physically making the transfer. Instead, the dispositive intent is that of the decedent or donor, which in this case is Hannah. If decedent had made the transfers in question and there was a claim the purpose behind the transfers was life-associated, the court would view this as one of many factors in determining decedent’s intent.
Taxpayer argues that the transfers were essentially made “in contemplation of life” and lacked any incidental testamentary purpose, and as such, are sufficient to rebut the statutory pre *269 sumption of a contemplation of death transfer. The Supreme Court has recognized that a donor may have more than one motive for making the transfer, some of which are associated with life and others with the distribution of property in anticipation of death. It is not necessary that the thought of death be the controlling motive for the transfer. “Irrespective of the existence of any life-associated motives, it is sufficient to create a gift in contemplation of death if an impelling motive exists to make a present disposition in lieu of a testamentary disposition.” In re Estate of Lichtenstein, supra, 52 N.J. 553 at 569, 247 A.2d 320 (quoting Swain, supra, 28 N.J. at 72,145 A.2d 320).
Courts have held where the donor is “only concerned with when to make gifts to certain donees, not whether to make them,” the gifts are made in contemplation of death. Makris, supra, 4 N.J. Tax at 144 (citing Schweinler v. Thayer Martin, supra, 117 N.J.Eq. 67, 175 A. 71.) Here, the desire to preserve decedent’s assets and secure government aid in financing the costs of nursing home care was an impelling motive, and Werner was clearly more concerned with when to make the gifts rather than whether to make the gifts. Inge testified the transfers would not have been made if she and Werner knew decedent would die shortly thereafter, as there would have been no reason to make the transfers since she would have inherited most of the estate anyway. Inge further acknowledged that an advantage of these transactions was the preservation of property for distribution out of Hannah’s estate.
The court finds that the divestiture of Hannah’s estate for Medicaid purposes is not a life-associated motivation. Such action indicates an intent to preserve the decedent’s assets and estate for her heirs and clearly constitutes a testamentary disposition.
The court finds that reasonable persons would not differ as to the conclusion that the motives for the transfers were testamentary in nature. Decedent was of advanced years, failing health, and resided in a nursing home when the transfer of virtually all of her assets was made to relatives who were the natural objects of her bounty and the principal residuary beneficiaries under her will. *270 Furthermore, such transfers tracked the allocation of Hannah’s residuary estate under the terms of her will.
In view of the foregoing factors, the court finds the reservation of a life estate for Hannah in the gifted realty and her retention of the right to the enjoyment of income therefrom was by its nature a transfer “intended to take effect at or after her death.” Furthermore, both the realty and cash transfers were made “in contemplation of death.” As such, these items were properly determined by the Director to be taxable transfers.
The Director also argues that the power of attorney did not grant Werner the authority to make the disputed transfers. Since the court has concluded that the real estate and cash transfers are testamentary dispositions and consequently taxable, a determination of this issue is not necessary.
The court will direct the entry of a judgment denying taxpayer’s claim for refund and affirming the Director’s assessment.

 The power of attorney, drafted in accordance with NJ.S.A. 46:2B-8, provided specifically that it would remain in effect even if the principal became disabled.

 The tax returns document rental income of $8,351 and expenses of $8,500, for a net loss of $149 for 1994, and a positive rental cash flow of $762 for 1995.

 This schedule is for a description and accounting of inter vivos transfers made by the decedent. In Hannah's case, the only transfers listed are the transfers in issue here: the two cash transfers, and the conveyance of 41 Vassar Place.

 Forty percent divided by sixty five percent results in 62% when rounded.

 Twenty five percent divided by sixty five percent results in 38% when rounded.

 The deed allocated Hannah's realty 62% to Inge and 38% to Jill Pauly. Inge received $87,054 of the $140,391 cash transferred (62%) and Jill Pauly received $53,347 (38%).