NARAYANAN, J.T.C.
This is the court’s opinion in connection with the trial held in the above-captioned inheritance tax matter. The court finds that the defendant (“Director”) properly determined that the decedent’s reported gift of shares of stock in PSE & G to the decedent’s executrix made within six months of his death, was in contemplation of his death and therefore taxable pursuant to N.J.S.A. 54:34-1(e).

UNDISPUTED FACTS

Peter Muscle, a New Jersey resident, died testate on January 4, 2008, at the age of 88. About six (6) months prior to his death, in July 2007, he allegedly gifted Linda Jackson 11,417.849 shares of stock in PSE & G.
As executrix, Jackson filed a New Jersey resident decedent inheritance tax return. She reported a gross estate of $973,427 *195 (rounded) comprising of bank balances and value of shares held by the decedent in Vanguard (an investment company). After deductions for estate expenses, she reported and paid the total tax due of $141,718.33.
On Schedule C of the return (transfers made by decedent), Jackson reported the transfer of the PSE & G shares from Muscle at a value of $1,038,947. She noted the donee was herself, as “friend” and that the transfer was for “no consideration.” She specified that the transfer “was not a gift in contemplation of death.”
The Director thereafter issued a Notice of Assessment increasing the tax to $322,055.75. He explained that the increase was due to the inclusion of $1,114,040, the date-of-death value of the gifted PSE & G stock pursuant to N.J.S.A. 54:34-l(c). He also disallowed an amount of $25,000 claimed as a deduction for attorney fees on grounds that the fees were paid to an attorney who was not admitted to practice in New Jersey.
After crediting the tax due (plus interest and penalty) with the amounts paid ($141,718.33), the Director demanded an additional amount of $214,206.27. Jackson paid this amount by two checks, one for $120,000 and the other for $94,206.27. Subsequently, the Director reduced the penalty to 6%, thus, by $10,808.89, and consequently, decreased his demand of tax plus interest and penalty to $345,115.71. However, he erroneously increased the credit for amounts paid by $60,000, and thus, paid a refund of $70,808.89 rather than $10,808.89.[1] Although Jackson does not dispute the Director’s erroneous payment of $60,000, she has not repaid this amount.
Jackson timely challenged the Director’s determination that the gift of the PSE & G stock was a taxable transfer, however, she did not challenge its date-of-death valuation.

*196
TESTIMONIAL EVIDENCE

Four witnesses testified on behalf of the plaintiff: Jackson, James DeMartino, Esq., Dr. Tasneem Rashid, and Dr. Gregory Sachs. Certain undisputed documents were entered into evidence as part of Jackson’s testimony, including Muscle’s death certificate and Wills, the inheritance tax return, and the documents in connection with the tax assessment challenged in this litigation.[2] The court finds the testimony of the four witnesses to be credible, except to the extent found otherwise in this opinion.
Muscle was a businessman. He owned a successful garden center since at least 1960, where he sold seasonal produce, fruits, flowers, and decorations. He sold the business sometime in 2002.
Jackson, a New Jersey native, met Muscle in 1960 while she was in high school. She worked at his business during school and intermittently during college. Muscle was a friend of her father and brother, as well as a frequent family guest. The employer-employee relationship between Muscle and Jackson became romantic sometime in 1963 or 1964, at which time Muscle was already divorced.
After completing college, Jackson obtained employment with Sears, and worked in New Jersey/New York for about ten (10) years. Sometime in 1979, she was promoted to Seal’s’ home office in Chicago. She decided to move to Chicago because despite her ultimatum to Muscle that they get married, Muscle fiercely resisted the idea on account of his prior traumatic divorce. She continued her employment in Chicago, became semi-retired in 2002, and then took full retirement in 2006. She owned a condominium in Chicago during this entire period and currently continues to own it. She continues to reside both in Chicago and in New Jersey.
Jackson and Muscle went out on frequent dates and dinners. They took annual vacations when his business was seasonally *197 closed, and continued to do so even after she moved to Chicago. They vacationed twice in Florida, thrice in Hawaii, and twice in California. During her international business trips, she stopped over in New Jersey to visit Muscle and her mother. Their friends recognized them as a couple. Although they never lived together, and resided in separate homes at all times, they maintained a close, trusting, and personal friendship throughout. Their closeness was also evidenced by the fact that he routinely gave her romantic gifts such as candy, flowers, and jewelry. His gifts of jewelry included several pieces of fine items with precious stones such as diamonds, opals, rubies, pearls, jade and the like.[3] In 1970, Muscle (at his own expense, time, and labor) helped Jackson renovate a two-family home which she had purchased for her mother in Liberty Corner, New Jersey.[4]
Jackson advised Muscle on his financial affairs. Due to his poor investment choices with the sale proceeds of his business, in 2002 Jackson suggested to Muscle that he should consider investing in Vanguard mutual funds since she had an investment portfolio with Vanguard, which she had found cost-efficient and conservative investment-wise. Muscle agreed. Jackson monitored Muscle’s investments to ensure his prior bad investment experience would not recur. In this connection, she reviewed and perused PSE & G’s periodic statements (addressed to Muscle) which showed the direct deposits by Muscle, and the continual re-investment of dividends.
*198 Despite Muscle’s reluctance to get married to her, Jackson continued to love him intensely and never veered from her desire to marry him. In 2006, the subject came up again and Jackson advocated for their marriage. Thereafter, Jackson and Muscle visited Florida for a vacation and decided to purchase property and settle down there. Jackson brought up marriage as part of settling down in Florida, but did not pressure or urge Muscle in this aspect. In furtherance of this plan, they had contacted realtors for potential joint purchase of a condominium in Bonita Springs. They had chosen Bonita Springs due to its proximity to the ocean since Muscle loved fishing, and also for cost reasons. In this connection, Jackson had also contacted an Illinois law firm for advice as to the tax aspects of the sale of her Chicago condominium vis-á-vis a purchase of another home in Florida. However, there had been no decision as to the exact date of relocation to Florida.
Sometime in or around September 2006, Muscle suffered a minor stroke. However, prior to, and even after this stroke, Muscle suffered no major health problems. He was always cheerful and upbeat. Jackson was, however, aware that Muscle was being treated regularly for blood clot problems with medication and blood monitoring (requiring withdrawal of blood every three months). A picture of Muscle taken in late 2006 in Florida shows him as an older gentleman with no evident outward physical disabilities.
Dr. Rashid, board certified in internal medicine and oncology, was Muscle’s primary care physician from 1988 until his death. She had treated Muscle for a blood disorder (essentially, a higher red blood cell count than normal) since 1988, and opined that he had performed well under her care and with the medication she prescribed. The blood disorder did not cause him any immune deficiency or weakness. Muscle had an irregular heartbeat for which he consulted a cardiologist. Muscle went by himself for his periodic office visits to Dr. Rashid, and was in full control of his mental faculties. He was never depressed, and never suggested to Dr. Rashid that he saw a bleak future for himself health-wise.
*199 Dr. Sachs, a board certified cardiologist, attended to Muscle from at least 1995 onwards. Muscle suffered from an irregular heartbeat due to a fall, which had not required heart surgery, but required medication and the installation of a pacemaker sometime in 1998. He also took medication to control his blood pressure, and to control the poor blood circulation in his legs (which had been diagnosed in 2002). Muscle suffered from age-related arthritis of the back, osteoporosis, acid-reflux and hiatal hernia, and underwent a cataract operation in 2002. Per Dr. Sachs’ opinion, none of these conditions was life threatening. Rather, they were normal for a person of Muscle’s age. Similarly, the fact that Muscle had a pacemaker installed did not indicate that Muscle’s life or longevity was at a higher risk than normal. Nor did the September 2006 minor stroke debilitate Muscle because he had made a good recovery with only a mild slurring of speech and suffered no other significant neurological problems.
Dr. Sachs saw Muscle at least once or twice a year, and during his visits, Muscle was always upbeat. Dr. Sachs viewed Muscle as enjoying life since he never discussed his longevity negatively. Dr. Sachs was acquainted with Jackson because he had received several inquiries from her about Muscle’s medications and health.
On or about October 12, 2006, Muscle executed his Will whereby he bequeathed to Jackson (i) personal property not otherwise specifically devised, and (ii) 80% of his residuary estate. The Will identified Jackson as Muscle’s “friend.” [5] The remaining 20% was devised in equal shares to Muscle’s nephew and niece, respectively. Muscle appointed the attorney who had drafted the Will as his executor. Jackson testified that she was aware of this Will since Muscle discussed the same with her sometime in late 2006.
In early 2007, Muscle was admitted to the hospital for pneumonia. While in the hospital, he contracted C. Difficile colitis (“C Diff”), a common bacterial infection causing severe and debilitating diarrhea. Following this hospitalization, he was in a rehabili *200 tation center for about two to three weeks. Jackson visited him every day during his stay at the center, and drove him home after the physical therapy ended. Muscle was placed on a powerful daily antibiotic which rendered him weak, but controlled the C Diff which had caused him dehydration and loss of weight.
Sometime in early to mid June 2007, Muscle was hospitalized due to another attack of C Diff. Jackson and Muscle had visited a specialist who put Muscle on the same powerful antibiotic. Muscle once again had to undergo physical therapy in Runnells rehabilitation center since he had become very weak due to the antibiotic.
Around this time (June-July 2007), Jackson and Muscle discussed his 2006 Will and discussed Muscle’s desire to change the executor in this Will. Jackson did not personally know of any New Jersey attorneys. During a conversation with a social worker at the rehabilitation center about Muscle’s background, such as whether Muscle had family and whether he had a Will, Jackson told the social worker that Muscle wanted some changes to be made in his Will, and whether the social worker could suggest any names in this regard. The social worker suggested an attorney in Warren, New Jersey, and he in turn, recommended James De-Martino, an attorney knowledgeable in the area of eldercare, wills, and estate planning.
Jackson thereafter contacted Mr. DeMartino. She met with him twice, once at her home in Liberty Corner in mid-June 2007, and once at the Runnells rehabilitation center later that same month. During Mr. DeMartino’s visit to her house, Jackson discussed Muscle’s desire for a change in the executor named in the 2006 Will. Jackson also provided Mr. DeMartino with a ballpark figure of the value of Muscle’s assets in the Vanguard funds and the PSE & G stock since she had access to and monitored the periodic financial statements sent to Muscle in this regard. Mr. DeMartino suggested that a reduction in the size of Muscle’s estate (by making a gift) would be beneficial not only for tax purposes but also for Medicaid. After Jackson conveyed this information to Muscle, he agreed to meet Mr. DeMartino.
*201 When he visited Muscle at the rehabilitation center, Mr. De-Martino had taken with him Muscle’s 2006 Will and had amended the language therein to reflect Jackson’s being named the executrix with no other major or substantive changes.[6] Mr. DeMartino and Muscle discussed Muscle’s long-term care planning and a reduction of his estate for purposes of Medicaid coverage and general tax benefits since Muscle had expressed concerns that “his longevity would result in the erosion of his estate for long-term care planning costs.” Mr. DeMartino advised Muscle that Medicaid law imposed a five-year look back period for purposes of Medicaid qualification {viz., Medicaid would impose a penalty in the form of no coverage for a certain number of months pursuant to a formula in instances where an applicant had made gifts or transfers in the five-year period preceding the application for Medicaid), and further that the gift should be an absolute unconditional transfer. In this connection, Mr. DeMartino advised Muscle that he should choose a donee whom he “trusted implicitly and blindly” to which Muscle replied that Jackson was the person he completely trusted. They also discussed that gifting at least part of the PSE & G stock would achieve Muscle’s long-term planning goals as Mr. DeMartino believed that the stock was the “heavy-hitting” asset.
Mr. DeMartino testified that he had nothing to do with the actual transfer of the PSE & G stock, but simply provided advice on the making of a gift. He did not know the manner or method by which the actual transfer took place, if it did. Mr. DeMartino only provided general advice to his clients that “what may be ideal for Medicaid purposes may have a horrific tax exposure” since the two concepts do not necessarily work in tandem, and in this connection, had similarly advised Muscle in generic terms of the estate and inheritance tax implications of a transfer or a gift.
After the discussions between Mr. DeMartino and Muscle end *202 ed, Muscle signed the Will which Jackson witnessed.[7] According to Mr. DeMartino, Muscle did not exhibit any signs of mental weakness or impediment, but was focused, fully competent and in good spirits, and had conveyed his intention to Mr. DeMartino of having a life together with Jackson. In Mr. DeMartino’s opinion, it was entirely within the realm of possibility that Jackson and Muscle would lead a long life together (although he had no recollection of the depth or extent of their relationship).
After Mr. DeMartino had left, Muscle was in good spirits and was pleased with the new Will and attorney. He told Jackson that he was very excited and glad to have gifted her with the PSE & G stock,[8] and now that the business of his Will was completed, he and Jackson could make their relationship legal, and clarified to Jackson that “legal” meant getting married in Florida. Muscle never conveyed to Jackson any concerns about his death at this point.
Sometime in late October/early November, and after the 2007 Will was executed, Muscle once again suffered a C Diff infection. This resulted in another visit to the hospital, and Muscle’s further weakening, which in turn entailed another period of stay at the rehabilitation center. Per Dr. Rashid, though fully treatable, it is not unusual for C Diff to recur, especially in older people such as Muscle, since it usually weakens a person’s immune system.
Very shortly thereafter in late November/early December, Muscle developed a problem with blood flow to his foot due to low blood pressure which required amputative surgery. Dr. Sachs examined him pre-surgery to ensure that there were no heart conditions prohibiting surgery and found no issues in this regard. Post-surgery, Muscle developed a sepsis infection. Sepsis is a general term for any kind of infection that is in the blood stream. It was the doctors’ conclusion that in Muscle, the sepsis infection *203 was primarily caused by the C Diff infection getting into the blood stream. Dr. Rashid opined that since Muscle’s immunity was very weak due to the recurring C Diff attacks, this would very likely have resulted in the failure of other organs. In such circumstances, the loss of blood circulation causes tissues to die which in turn causes infection to get into the blood stream, i.e., sepsis. While sepsis is normally treatable, it sometimes does not respond to the antibiotics whether the patient is young or old. Dr. Sachs’ projected that had Muscle overcome the sepsis infection, he would have lived for at least four to five years more, purely from the standpoint of his heart.
Muscle died on January 4, 2008. His death certificate, signed by Dr. Rashid, indicated the primary cause for death as cardio-respiratory arrest due to sepsis (the secondary reason). Jackson was with Muscle throughout this and until his death.
After Muscle’s death and after she became executor of Muscle’s Will, Jackson contacted PSE & G as well as the Bank of New York (which administered PSE & G’s dividend reinvestment aspect of the stock holdings) to obtain information as to the current value of the PSE & G stock. She stated that her Chicago lawyers needed this information for purposes of effectuating the transfer of the stock gifted by Muscle to herself. She engaged in this task of obtaining information only after Muscle’s death and only after she became executrix of his Will.
Also after Muscle’s death, and as executrix of his Will, Jackson found some canceled checks from his checkbook indicating a check in the amount of about $10,000 or $12,000 made out to his sister, and one to his friend/employee, Fred Bereaw.[9] When Muscle wrote these checks, he had told Jackson that they were gifts for the birthday of his only sister (who lived in Montana) and to help Bereaw out. Jackson conceded that these payments by Muscle could have been loans on which Muscle did not collect. She also stated that Muscle was not close to any of his family members, including his sister.

*204
FINDINGS

The New Jersey Transfer Inheritance Tax Act (N.J.S.A. 54:33-1 et seq.) (“Act”) creates a presumption that a gift made by a decedent during his life, is taxable as a testamentary substitute if the same was made in “contemplation of death” or is “or intended to take effect in possession or enjoyment at or after such death.” N.J.S.A. 54:34-1(c). This presumption exists where the gift was “made without adequate valuable consideration ... within three years prior to the” decedent’s death and comprised “a material part of [the decedent’s] estate” or was “in the nature of a final disposition or distribution thereof.” Ibid. No such presumption exists if the decedent had gifted a material portion of his or her estate prior to the “three-year period.” Ibid.
The statutory presumption requires the State to initially “prove by a preponderance of evidence” four essential facts, namely, (a) a transfer; (b) without adequate consideration; (c) of a material portion of the decedent’s estate; and (d) made within three years of the decedent’s death. Swain v. Neeld, 28 N.J. 60, 67, 145 A.2d 320 (1958). Here, it is undisputed that Muscle’s gift of his shares of stock in PSE & G to Jackson occurred six to seven months prior to his death. There was no consideration for such transfer. The shares were worth about $1,114,040 (as of Muscle’s date of death), and comprised about 53% of Muscle’s estate of about $2,069,000.[10] Clearly, the shares constituted a significant, and thus, a material portion of Muscle’s estate. See e.g. Makris v. Director, Div. of Taxation, 4 N.J.Tax 139, 144 (Tax 1982) (transfers amounting to 36.7% of the decedent’s estate “constituted a material part” of the same); Maguire Estate v. Director, Div. of Taxation, 9 N.J.Tax 437, 445-46 (Tax 1987) (gifts valued as of the decedent’s death and “representing 17.7% of decedent’s estate, are *205 substantial” and thus, “constitute a ‘material part’ of [the] estate”). The Director has thus satisfied his burden of proof under N.J.S.A. 54:34-1(c).
The burden now shifts to the plaintiff not only to prove by a preponderance of the evidence that Muscle’s gift of the PSE & G stock to Jackson was not made in contemplation of his death, but also to ultimately persuade the court in this regard. Swain, supra, 28 N.J. at 65-68, 145 A.2d 320. The taxpayer’s proofs in this regard must be competent and “strong enough” such that “reasonable persons would differ about whether the presumed fact could be found.” Estate of Berg v. Director, Div. of Taxation, 17 N.J.Tax 256, 264 (Tax 1998).
The statutorily undefined term “contemplation of death” is not “limited ... to its literal meaning of a gift ... made with the known imminence of death.” In re Estate of Lichtenstein, 52 N.J. 553, 567-68, 247 A.2d 320 (1968). In other words, a transfer may be taxable even when made without thoughts of immediate or imminent death and “the thought of death” need not be the “controlling motive” for the gift. Id. at 570, 247 A.2d 320 (contrasting with this requirement under the federal estate tax law). Rather, the test in New Jersey is whether, regardless of “the existence of any life associated motives,” the decedent had an “impelling motive ... to make a present disposition in lieu of a testamentary disposition.” Swain, supra, 28 N.J. at 69, 145 A.2d 320. Thus, a gift can be deemed as made in contemplation of death where a “transferor devoid of any thought of escaping inheritance taxes” makes a gift because he or she is “motivated by a desire to make an essentially testamentary disposition of his [or her] property.” Ibid. See also N.J.A.C. 18:26-5.7(b) (defining “contemplation of death” to include “that expectancy of death which actuates the mind of a person of the execution of his will and is therefore not restricted to that expectancy of death which actuates the mind of a person making a gift causa mortis”).
The question of whether the decedent had an “impelling” motive to make a gift during his life as opposed to after his death is factual. Lichtenstein, supra, 52 N.J. at 570, 247 A.2d 320. In *206 other words, determination of the fact that the gift is a “testamentary substitute depends upon the donor’s subjective state of mind at the time of the transfer, and that state of mind is a question of fact ... to be ascertained by reconstruction by means of objective indicia.” Meyerson v. Director, Div. of Taxation, 15 N.J.Tax 128, 133-134 (Tax 1995). Objective indicators of a decedent’s intent include, but are not limited to:
the age and general condition of health of the donor at the time of making the gift; the time interval between the inter vivos transfer and death; the existence of a desire to evade inheritance taxes; whether or not the inter vivos transfer was part of a testamentary scheme or plan; past history of substantial gifts by the donor; whether or not the gift was made to the natural objects of the donor’s bounty; whether or not there existed an emergency situation which may have prompted the donation (e.g., donee’s illness requiring large expenditures).
[Swain, supra, 28 N.J. at 70, 145 A.2d 320]
It is undisputed that Muscle was advanced in age when he told Jackson he was gifting her with the PSE & G stock. Based upon the evidence adduced before this court, although he was mentally sharp and cheerful, Muscle’s general physical health was weak due to the recurring C Diff attacks, which in turn, had weakened his immune system causing him to be more susceptible to the sepsis infection. The court also finds from the sequence of events that Muscle was undoubtedly concerned about his state of health during the time of the gift. Muscle was interested in meeting Mr. DeMartino after Jackson informed him of the attorney’s suggestion of the reduction of his estate for long-term care/Medicaid purposes. The two of them discussed not merely the change in executors of Muscle’s 2006 will but also reducing Muscle’s estate by unconditionally transferring a significant portion of his assets so as to receive Medicaid coverage.
In Estate of Berg, supra, the decedent’s attorney-in-fact testified that he made the transfers on the decedent’s behalf to qualify the decedent for Medicaid benefits. 17 N.J.Tax at 269. The taxpayer argued that the transfers were essentially made “in contemplation of life” and lacked any incidental testamentary purpose, and as such, were sufficient to rebut the statutory presumption that the transfers were made in contemplation of death. Id. at 268. However, the court recognized that a donor *207 might have more than one motive for making a transfer, some of which can be associated with life and others with the distribution of property in anticipation of death. Id. at 269. The court ruled that a “desire to preserve decedent’s assets and secure government aid in financing [health care costs]” though an “impelling motive,” only indicated a concern for “when to make the gifts rather than whether to make the gifts” where the donee was also the residuary beneficiary under the decedent’s will. Ibid, (citations omitted). Indeed, the “divestiture” of the decedent’s estate “for Medicaid purposes” evidenced an “intent to preserve the decedent’s assets ... for her heirs ... who were the natural objects of her bounty and the principal residuary beneficiaries under [the decedent’s will] ... and clearly constitute^] a testamentary disposition.” Ibid.
Plaintiff maintains that Estate of Berg is factually distinguishable. It maintains that unlike that case, there is no testimonial evidence here that Muscle’s gift to Jackson was to reduce his estate for Medicaid purposes. Rather, Muscle transferred the PSE & G stock as an engagement present, and as a token of the celebration of an impending marriage to Jackson. Plaintiff argues that as an “intelligent” businessman, Muscle simply could not have been persuaded by Mr. DeMartino’s “pitch,” because Muscle had made up his mind to gift the PSE & G stock even before Mr. DeMartino’s “presentations,” and because the gift was purely for personal purposes, namely, as a pre-wedding present.
The court is not persuaded. First, Mr. DeMartino, as an attorney with expertise in long-term care and estate planning attorney, advised an unconditional disposition of Muscle’s assets to someone Muscle implicitly trusted, for purposes of obtaining Medicaid coverage under federal law. There is nothing in the evidence to show that this ordinary legal advice was a “pitch” for Muscle to dissipate his assets, or that Muscle had resisted, or was coerced into, meeting Mr. DeMartino. Second, the uncontradicted evidence shows that Mr. DeMartino was retained because he was recommended as an attorney with expertise in eldereare and long-term care planning. Mr. DeMartino discussed with both Jackson and Muscle about the benefits of reducing Muscle’s estate by *208 making unconditional gifts of a significant portion of Muscle’s estate for Medicaid purposes, and the limitations of qualifying for Medicaid in this regard, namely, the five-year look back period. Jackson even provided Mr. DeMartino a ballpark estimate of Muscle’s assets for this purpose.
Third, there is simply nothing in the record to evidence that Muscle was planning to make a gift of the PSE & G stock to Jackson before Muscle met Mr. DeMartino. To the contrary, the sequence of events establish that it was only after Jackson met with Mr. DeMartino and the latter suggested that a gift of a portion Muscle’s estate for Medicaid purposes would be beneficial, did Jackson report this suggestion to Muscle, and only thereafter did Muscle agree to meet Mr. DeMartino. As between Muscle and Mr. DeMartino, the gift discussed for Medicaid purposes was the PSE & G shares because they comprised a bulk of Muscle’s wealth. It is clear from the record that the stock was “going to be definitely a part” of Muscle’s gift, even if not the only gift. Mr. DeMartino advised Muscle to make the gift to someone he implicitly trusted, and Muscle identified Jackson as being such a person. Further, when Jackson came back into the room after Muscle and Mr. DeMartino had finished their discussion, she agreed that “there was a discussion at that point in time in the presence of Mi’. DeMartino relevant to a gift being made.” From the evidence before this court, it simply cannot be concluded that Mr. DeMarti-no’s only involvement was a change in the executor in Muscle’s 2006 Will, or that Muscle had already decided to make a gift of the PSE & G stock to Jackson prior to his meeting Mr. DeMartino or in the absence of Mr. DeMartino’s advice of reducing his estate for Medicaid purposes.
The court also does not find persuasive plaintiffs argument that the gift of stock to Jackson was made in celebration of marriage. This contention is simply not supported by the record. Muscle did not consult a matrimonial lawyer before he made the gift of the PSE & G shares. He consulted an estate lawyer.[11] There was *209 simply no corroboration to Jackson’s testimony that Muscle meant “marriage” when he informed her that they could go to Florida to “make it legal.” There was nothing in the record showing that Muscle had a history of presenting Jackson with intangible property, such as shares of stock. His pattern of romantic gift giving of expensive jewelry, candy, or flowers did not include transfer of the ownership of his assets, tangible or intangible, to Jackson. Indeed, the gift of the PSE & G stock, an intangible asset comprising a very substantial portion of Muscle’s wealth, is inconsistent with Muscle’s prior gift-giving behavior to Jackson, and it was only after Muscle consulted Mr. DeMartino did he gift the PSE & G stock to Jackson.
Nor does the court find credible Jackson’s unsubstantiated testimony that Muscle’s alleged two checks to his sister and employee evidenced Muscle’s pattern of gift-giving. No other documentary proof was submitted to show that Muscle made sizable gifts to any person during his lifetime (for example, the federal gift-tax returns or estate tax returns). Indeed, Jackson admitted that these purported gifts may very well have been loans upon which he never collected, and that Muscle was never close to his sister.
Although in Estate of Berg, supra, the decedent’s attorney-in-fact testified that he made the transfers on the decedent’s behalf to qualify the decedent for Medicaid, 17 N.J.Tax at 268, whereas here Mr. DeMartino testified that he only advised Muscle in this regard but did not have any role in the actual transfer of the PSE & G stock, this distinction is irrelevant. Based upon the evidence adduced before this court, namely, the consistent testimony of both Jackson and Mr. DeMartino, the court finds that Muscle’s intent to gift the PSE & G stock to Jackson was motivated by reducing his estate for purposes of qualifying for Medicaid benefits.
*210 That Medicaid’s five-year look back period may lead to an inference that by making the gift Muscle anticipated living at least five more years, thus, a period more than the three year period of N.J.S.A. 54:34-1(c), such inference cannot control the interpretation of the statute.[12] First, in Estate of Berg, supra, the court ruled that the “divestiture of [the decedent’s] estate for Medicaid purposes is not a life-associated motivation.” 17 N.J.Tax at 269. Rather, it only evidenced “an intent to preserve the decedent’s assets and estate for her heirs and clearly constitutes a testamentary disposition.” Ibid.
Second, even if this court was to deem the transfer of a significant portion of Muscle’s estate as partially life-associated (i.e. to ensure continuing long-term health care through Medicaid), plaintiff still maintains the burden of demonstrating that Muscle did not have any impelling motive to make a transfer in lieu of a testamentary disposition. As our Supreme Court noted, “fijrrespective of the existence of any life-associated motives” a gift falls within the purview of N.J.S.A. 54:34-1(c) if there is an “impelling motive” to gift now (during life) what could or would have been gifted through a testamentary disposition. Swain, supra, 28 N.J. at 69-70, 145 A.2d 320 (emphasis added). The evidence before this court indicates that Muscle’s gift of the PSE & G stock was impelled by his desire to qualify for Medicaid coverage. The gift was to Jackson, the natural object of Muscle’s bounty. This is evidenced not only by her close and romantic relationship with Muscle for many years, but also by the fact that that Muscle considered only Jackson as someone he trusted implicitly and *211 therefore, a worthy recipient of his gift. Additionally, Muscle’s transfer to Jackson of more than half of his total estate follows the pattern from his 2006 and 2007 Wills whereby Jackson was the only beneficiary entitled to the majority of Muscle’s estate (80%). Thus, Muscle’s gift was in the nature of a distribution of property rather than a bestowal of a favor or an act of appreciation or a wanton munificence upon Jackson (who was not in any manner impoverished from the record presented to this court). It was a distribution he would make by a Will, for a purpose that would actuate him to make a Will (benefit Jackson who would be the natural bounty of his affection), and in the manner he would have distributed after his death (primarily to Jackson). Therefore, his actions fall squarely within the parameters of a transfer “in lieu of a testamentary disposition” under Swain.
The court finds that reasonable persons would not differ that the transfer made by Muscle was the product of an impelling motive to make a present disposition in lieu of a testamentary disposition. The court is sympathetic to plaintiff’s “contemplation of life” argument, however, this should cede to the overriding legislative intent, namely, that “the purpose of the contemplation of death provision was to tax those vivos transfers of property which were, in substance, substitutes for testamentary dispositions.” Swain, supra, 28 N.J. at 69, 145 A.2d 320. The evidentiary presumption and burden shifting scheme of N.J.S.A. 54:34—1(c) promote fairness and probability given that “[t]he State [is] seldom able to offer evidence that the gift was in contemplation of death. The salient facts to the inquiry are almost entirely in the possession of the taxpayer, and the witnesses are often interested parties.” Id. at 66, 145 A.2d 320.
Based on the facts adduced by this court, the result achieved by Muscle during his life, namely ownership of the stock by Jackson, is the same result that would have occurred upon his death.[13] The *212 inter vivos transfer was in lieu of a testamentary disposition. Plaintiffs evidence has not overcome the statutory presumption nor persuaded this court otherwise. Therefore, the transfer was properly determined by the Director to be a taxable transfer pursuant to N.J.S.A. 54:34-1(c).

CONCLUSION

The Director’s final determination is upheld. Plaintiff has conceded that the Director had refunded her amounts in excess of what was due. Therefore, the parties will compute and resolve amongst themselves the correct amount owed in light of this opinion. The parties will submit an Order in this regard and in accordance with this opinion within twenty (20) days of the date of receipt of this Opinion.

 it appears that the Director read the numerical portion of the $120,000 check as $180,000 although the written figure clearly stated it to be “One Hundred and Twenty Thousand.”

 The Director’s evidence comprised of the documents imposing the assessment (which were introduced into evidence by plaintiff), in addition to cross-examination of the plaintiff's witnesses.

 Jackson opined that the current value of the gifted jewelry was at least $150,000 and offered to present some pieces of the jewelry into evidence. The Director objected because they were not included in the list of exhibits intended to be used at trial as required by this court's case management order, and due to surprise. The court agreed and denied the plaintiffs request. In any event, their inclusion into evidence is not relevant since the court finds credible Jackson's testimony that Muscle gifted her with jewelry, and the Director did not dispute this fact.

 Jackson did not have documentary evidence of this during her testimony but stated that she had all the receipts of the amounts spent by Muscle in boxes at her home.

 Jackson was noted in the 2006 Will to be then residing in Liberty Corner, New Jersey.

 Thus, Jackson was still the beneficiary of 80% of Muscle's residuary estate, and Muscle's niece and nephew were the equal beneficiaries of the remaining 20%. The 2007 Will did not identify Jackson as Muscle's "friend.”

 Jackson noted her Chicago address on the witness’ signature page.

 Jackson had a rough idea of the value of the PSE & G stock when Muscle told her about his gift to her of the same because she monitored the PSE & G statements in this regard.

 Jackson did not have copies of these checks with her at trial.

 The inheritance tax return reported about $930,000 as Muscle’s net estate. Due to the Director’s disallowance of attorney fees of $25,000, the net estate increased to about $955,000. This amount when added to the value of the PSE & G stock of $ 1,114,040, provides a net estate of about $2,069,000. The share value of $1,114,040 divided by the amount of net estate of $2,069,000 provides a ratio of 53%.

 While Mr. DeMartino testified that marriage would lower the inheritance tax, there was no testimony about the effect marriage would have on Medicaid *209 coverage, such as for example, whether the spouse's assets would be included for purposes of eligibility for coverage.

 Nothing was presented to this court to show that this five-year period under the federal law was enacted for the same purpose as N.J.S.A. 54:34-1 (c), namely, a transfer in contemplation of death. Further, tying the interpretation of N.J.S.A. 54:34-1 (c) to a federal statute’s time-line could lead to conflicting results. If, for instance, the look-back period was two years under the Medicaid statute, would that require an automatic inference that the decedent did not expect to live for three years for purposes of N.J.S.A. 54:34-1 (c), therefore, the transfer must be taxable? Such a result would negate consideration of the objective factors of transfers in contemplation of death under our law. See Swain, supra, 28 N.J. at 70, 145 A.2d 320; Estate of Lichtenstein, supra, 52 N.J. at 567-68, 247 A.2d 320.

 It does not appear that the gift was even effectuated during Muscle's lifetime. There was no testimony that Muscle initiated any directions to PSE & G for transfer of ownership at any time after Mr. DeMartino visited Muscle in late June or early July 2007. Indeed, Jackson reiterated her testimony that it *212 was she who undertook the process of the transfer of the PSE & G stock to herself, and this was done only after Muscle's death and as the executrix of his Will. Under these circumstances, it could very well be that the stock passed to Jackson under the terms of Muscle's Will, and thus, would be fully taxable.