NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

_____
                               :

ESTATE OF                     :     TAX COURT OF NEW JERSEY

EDITH CHERNOWITZ,       :     DOCKET NO: 004863-2017
                               :

           Plaintiff,    :

                               :

            vs.         :

                               :

DIRECTOR,                 :

DIVISION OF TAXATION,    :

                               :

           Defendant.   :

_____:

Decided: November 16, 2018.

Douglas S. Stanger for Plaintiff (Flaster Greenberg, P.C., attorneys).

Heather Lynn Anderson for Defendant (Gurbir S. Grewal, Attorney General of New Jersey, attorney; Steven J. Colby on the brief).

**CIMINO, J.T.C.**

I.     **INTRODUCTION**

In 2012, at the age of ninety-eight years, Edith Chernowitz gifted 5.1 million dollars of her 18 million dollar in assets to her family. The federal unified estate and

gift tax exclusion was scheduled to be reduced after December 31, 2012 from 5.12 million to 1 million dollars. Ms. Chernowitz died in 2014. Her estate, the taxpayer in this case, was assessed New Jersey transfer inheritance tax on the entire 5.1 million dollar gift. The law sets up a presumption that transfers made within three years of death are in contemplation of death if certain elements to establish the presumption are satisfied. The taxpayer estate argues that all the elements have not been satisfied and even if they have, the presumption has been rebutted. For the reasons set forth in much greater detail in this opinion, the court determines that the elements establishing the presumption have been met, and that the taxpayer has failed to overcome the presumption.

## II.    STATEMENT OF FACTS

Edith Chernowitz was born on December 25, 1914. She was married to George Chernowitz. They did not have any children. She did have six nieces and nephews, including Richard Jacoby, M.D.

In 1947, Ms. Chernowitz and her husband George founded American Power Jet, a seemingly successful engineering company that was a United States Department of Defense contractor for fifty-five years. In 2001, Ms. Chernowitz executed a last will and testament. The will provided that the rest, residue and remainder of her estate was to go to her husband, George Chernowitz. In the event

that her husband predeceased Ms. Chernowitz, her will provided her nephew Richard was to get $500,000 in cash and that the rest, residue and remainder would go to charity. The charitable organizations were to be selected by her executor with the purpose of enhancing human health and well-being through medical advancements in the fields of blood circulation and mental health. As to her personalty, such as clothing, jewelry and household effects, this was to go to her husband, or, in the alternative, to Richard. She named her husband as the executor of her estate. In the event that he was not able to act, Richard would act as executor instead. The will prepared by Ms. Chernowitz was nearly identical to the will which was also prepared by her husband. Her husband passed in 2002.

After her husband George's death in 2002, Edith Chernowitz resided alone in a condominium located in North Bergen in northern New Jersey. Thereafter, Richard suggested that Ms. Chernowitz relocate from her longtime home in North Bergen to a place closer to Richard's residence in Moorestown in southern New Jersey.

In 2006, Ms. Chernowitz moved to the independent living section of The Evergreens, a continuing care community in Moorestown. Being close by, she regularly attended various family events held by Richard and his family.

Ms. Chernowitz suffered from a number of ailments and conditions, including cataracts and the need for the insertion of a Foley catheter. In September 2011, she

was referred by the physician at The Evergreens to undergo a colonoscopy because of anemia and blood in her stool. The colonoscopy revealed that she was suffering from colon cancer. She thereafter underwent surgery on November 11, 2011, in which a portion of her intestines containing a tumor that measured four centimeters by three centimeters by one centimeter was removed. The estate asserts that she made a full recovery after the surgery. The doctor at The Evergreens recommended that she see an oncologist for follow up, but she declined. The doctor indicated that it is not unusual for someone of her age to not undergo chemotherapy. There was also some talk of doing a repeat colonoscopy, but that was later ruled out due to her advanced age.

In August 2012, Ms. Chernowitz told the nurse with her family physician that the specialist told her not to worry about cancer. It is unclear whether the specialist actually said this, and if he did, whether this meant that she was cancer free, the cancer was progressing slowly, or that at her age there was not much more that could be done. However, the specialist's report from the time did indicate she had blood in her stool and suffered from an "anemia, presumably due to blood loss." This seemed to be an ongoing intermittent problem. The specialist was unclear as to the cause, but thought it could be from an anastomotic ulcer. In September 2012, she was found lying on the floor in vomit in her apartment. In November 2012, she

reported that she had an unexplained episode of weakness and vomiting on a previous day.

Richard asserts that Ms. Chernowitz regularly read the New York Times from cover to cover. Moreover, her family physician at The Evergreens indicates that Ms. Chernowitz would clip stories from the Wall Street Journal that she thought would be of interest to the physician.

Ms. Chernowitz notified Richard that the law as to gifts was going to change at the end of 2012. It is unclear whether she obtained this information on her own through her reading of the New York Times and the Wall Street Journal, or whether she was informed by her financial advisor, Eric Bodner.

In a 2015 affidavit, her financial advisor, stated that discussions began in early 2012 of the possibility of making a one-time 5 million dollar gift to provide potential federal estate tax savings of 2 million dollars.[1] Later, in response to third-party

---

[1] The federal estate tax and gift tax are part of a unified tax system. For example, if someone gifts assets prior to death, it counts against the lifetime unified gift and estate tax exclusion amount which in 2012 was 5.12 million dollars. Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107-16, § 521(a), 115 Stat. 38, 71. Tax Relief Unemployment Insurance Reauthorization and Job Creation Act of 2010, Pub. L. No. 111-312, § 302(a), 124 Stat. 3296, 3301. See generally, 26 U.S.C. §§ 2010, 2505. In 2013, the exclusion was scheduled to be reduced to one million dollars. Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107-16, § 901, 115 Stat. 38, 150. Tax Relief Unemployment Insurance Reauthorization and Job Creation Act of 2010, Pub. L. No. 111-312, § 101(a), 124 Stat. 3296, 3298. Thus, from a federal tax perspective, there was a strong incentive to make a gift in 2012 up to 5.12 million dollars since if death occurred in a later year, assets passing at death would potentially only have

interrogatories from 2018, the financial advisor stated that it was his "recollection" that Ms. Chernowitz first discussed her intent to make a gift prior to any discussion of the potential expiration of the lifetime exclusion amount.

In the notes of her attorney, Robert A. Bacine, Esquire, from 2012, in correspondence sent in 2012 from Mr. Bacine to Ms. Chernowitz and Richard, and in an affidavit in 2018, Mr. Bacine indicated that Ms. Chernowitz had been advised by her financial advisor to make a gift in the amount of 5 million dollars because of the impending change in the law.

In answers to interrogatories, Richard certified that Ms. Chernowitz notified him that she was considering revising her will and asked if he knew any estate planning attorneys. He recommended Mr. Bacine, who had represented him for some twenty to twenty-five years. In follow-up interrogatories, Richard stated that while he could not recall the exact date of the initial conversation he had with Ms. Chernowitz concerning potential revisions to her will, he believed it occurred one to two months prior to a December 4, 2012 meeting with Mr. Bacine.

The notes of Mr. Bacine indicate that Richard called his office on November 30, 2012 to set up an appointment. Mr. Bacine's notes indicate her address, her age,

---

a million dollar exclusion. In any event, Congress acted on January 1, 2013, and the president signed on January 2, 2013, legislation that set the lifetime exclusion at 5.25 million dollars for 2013 and indexed to inflation for later years. American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 101(a), 126 Stat. 2313, 2315.

that she had a colon cancer operation about a year ago and was very lucid.  There was also a listing of items such as a will, POA [sic], HC [sic] directive, assets and a family tree.  It is unclear whether this is a list of items Mr. Bacine wanted available at the appointment.

Mr. Bacine met with Ms. Chernowitz and Richard on December 4, 2012.  Mr. Bacine stated that he was provided a copy of the will at the meeting.  His notes indicated that her income from 2011 consisted mostly of tax exempt interest from the vast municipal bond portfolio she held.  According to his notes, of the $882,000 in income for 2011, $798,000 was from tax free municipal bonds.  He further noted gifting 5.12 million from 16 to 17 million dollars in assets, which consisted mostly of municipal bonds.

Mr. Bacine's follow up notes of December 10, 2012 indicated that her assets consisted of 18 million dollars total, with 1.5 million dollars of accumulated cash.  Mr. Bacine also spoke to her financial advisor, Mr. Bodner, in New York City, and Mr. Bacine's notes indicated that Mr. Bodner had been handling Ms. Chernowitz' investments for twenty-five years and suggested gifting because of the then upcoming change in the law.  Moreover, his correspondence stated that "you have advised me of your desire, upon the recommendation of your financial advisor, Eric Bodner, to make substantial gifts to or for the benefit of your nephew and his family."  Various paperwork had to be executed to complete this process and Ms.

Chernowitz and Richard went to see her financial advisor in Manhattan on December 18, 2012. Her attorney, Mr. Bacine, had the necessary paperwork sent directly to the financial advisor for execution. Parenthetically, Richard asserts that Ms. Chernowitz spent the day of December 18, 2012 walking around Manhattan.

Of the nearly 5.1 million dollars that was eventually transferred, 2.8 million was transferred outright to Richard. Another amount in excess of 2.0 million dollars was transferred to a trust to benefit Richard, his wife and two children. Finally, $300,000 was gifted to a special needs trust that was previously created by Richard's mother to benefit his brother Stuart, who was on social security disability for bi-polar disorder.

Thereafter, Mr. Bacine's office prepared a federal gift tax return for 2012. The return reveals that Ms. Chernowitz not only made the $300,000 transfer to the trust on behalf of Stuart in 2012, but had also made yearly transfers to the trust from 2006 through 2011 of $11,500 to $12,500. Mr. Bacine explained in the 2012 gift tax return that Ms. Chernowitz was advised that these gifts qualified for the applicable annual gift tax exclusion for each of those years.[2] Moreover, Mr. Bacine indicated that he was not informed or aware that Ms. Chernowitz had made any other

_____

[2] Separate and apart from the lifetime exclusion is the gift tax annual exclusion. 26 U.S.C. § 2503(b). The annual exclusion was $11,000 for 2002 through 2005, $12,000 for 2006 through 2008, and $13,000 for 2009 through 2012. See 26 U.S.C. § 2503(b)(2), I.R.S. Pub. No. 950, 3 (Oct. 2011).

gifts than those listed.  Richard also confirmed with Ms. Chernowitz that she was one hundred percent certain that she never made a gift greater than the annual exclusion amount.  Mr. Bacine also indicated that Ms. Chernowitz did not care how the money was divvied up, as that was left to Richard's discretion.

When asked why Ms. Chernowitz did not revise her Will any time before her time of death, Richard stated that Ms. Chernowitz "was a stickler for detail, extremely meticulous.  She got -- and this is probably why we never ended up revising her will, because she got so far into the weeds with things and, as you can see, she wrote it over and over and over.  It was hard to actually finish certain things . . . ."

Ms. Chernowitz' date of death was October 25, 2014.

### III.  LEGAL ANAYLSIS

#### A. Introduction

The New Jersey Transfer Inheritance Tax, N.J.S.A. 54:33-1 to 54:36-6, imposes a tax on the transfer of real and personal property from a decedent's estate.  N.J.S.A. 54:34-1.  Executors, administrators, trustees, grantees, donees or vendees are personally liable until the tax is paid.  N.J.S.A. 54:35-2.  The decedent's death triggers the tax obligation.  N.J.S.A. 54:35-1.  "The primary objectives of N.J.S.A. 54:34-1 were to place testamentary gifts and those inter vivos transfers that are

essentially testamentary in nature into the same succession tax category, to secure equality of taxation and prevent the evasion of taxes." Estate of Berg v. Dir., Div. of Tax'n., 17 N.J. Tax 256, 262 (Tax 1998). The law taxes transfers:

> Where real or tangible personal property within this State of a resident of this State or intangible personal property wherever situate of a resident of this State . . . is transferred by . . . gift made in contemplation of the death of the . . . donor, or intended to take effect . . . at or after such death.
>
> [N.J.S.A. 54:34-1]

The issue in this case is whether the 5.1 million dollar transfer by Ms. Chernowitz was in contemplation of death.

When initially adopted in 1892, the tax only reached inter vivos transfers intended to take effect in possession or enjoyment at or after death. L. 1892, c. 122. Swain v. Neeld, 28 N.J. 60, 68 (1958). The problem is that this provision alone failed to reach certain absolute gifts such as the 2.8 million dollar outright gift to Richard. Thereafter, in 1906 the law was amended to also impose the tax upon transfers made in contemplation of death. L. 1906, c. 228. Ibid. While in theory the contemplation of death provision captures irrevocable trusts and gifts, in practice it was difficult to implement since the Director had the burden of proving that the transfer was in contemplation of death.

## B. The presumption of in contemplation of death

The statute was amended in 1922 to introduce the so-called presumptive period of two, now three, years. L. 1922, c. 174, § 1. Id. at 64. The law was amended again in 1951 to indicate that transfers made outside the so-called presumptive period are deemed not to have been made in contemplation of death. L. 1951, c. 250, § 1. In re Estate of Lichtenstein, 52 N.J. 553, 566 (1968).

The provision as it now stands indicates:

> A transfer by . . . gift made without adequate valuable consideration and within three years prior to the death of the . . . donor of a material part of his estate . . . shall, in the absence of proof to the contrary, be deemed to have been made in contemplation of death . . . but no such transfer made prior to such three-year period shall be deemed or held to have been made in contemplation of death.
>
> [N.J.S.A. 54:34-1(c)]

To break it down, the three elements to establish a presumptive period are:

1. A transfer without adequate valuable consideration;

2. Within 3 years prior to death of the donor; and

3. Of a material part of the estate.

Each of these elements will be considered in turn.

A transfer by gift without adequate consideration is undisputed here. There is not any claim that Ms. Chernowitz received something in return for the 5.1 million

-11-

dollar gift.  Second, the gift was made in 2012 and Ms. Chernowitz passed in 2014, which is indisputably within three years.  The parties dispute the third element which provides that the transfer was a material part of the estate.  Ms. Chernowitz' estate was worth approximately 18 million dollars.  She transferred 5.1 million dollars.  The seminal case in the modern era dealing with the contemplation of death issue is Swain, in which there was a transfer of approximately one-third of the decedent's accumulated fortune.  28 N.J. at 71.  However, the Court did not squarely address whether this constituted a material part of the estate, nor is it clear whether the issue was in contest.[3]

However, in Makris v. Dir., Div. of Tax'n., 4 N.J. Tax 139, 144 (Tax 1982), the Court determined that a transfer of 36.7% of decedent's estate constituted a material part of the estate.  In Estate of Maguire v. Dir., Div. of Tax'n., 9 N.J. Tax 437, 444 (Tax 1987), the court determined that 17.7% constituted a material part of the estate.  In Meyerson v. Dir., Div. of Tax'n., 15 N.J. Tax 128, 134 (Tax 1995), the Court determined the transfer of nearly 30% of the estate constituted a material part.  Moreover, the Appellate Division determined in In re Estate of Shivers, 105 N.J. Super 242, 246 (App. Div. 1969) that 25% constituted a material part of the estate.

---

[3]  The Swain decision focuses more upon what is needed to overcome the three-year presumptive period once the three initial elements are satisfied.  See 28 N.J. at 69-72.

In this case, the 5.1 million dollar bequest constitutes approximately 28% of the estate. This is certainly greater than the size of estates previously considered by both the Appellate Division and this court as constituting a material part. Thus, it is determined that the transfer here constitutes a material part of the estate.[4]

## C. Rebutting the contemplation of death presumption

While transfers outside the three-year period are deemed to have not been made in contemplation of death, transfers within the three-year period only set up a presumption which the estate has the opportunity to rebut. The statutory presumption operates to shift the burden of ultimate persuasion by a preponderance of the evidence from the State to the taxpayer. Swain, 28 N.J. at 67-68. The Supreme Court has enumerated a number of factors to be considered to determine whether an estate has met its burden. These factors are:

1. Age;

2. General condition of health of the donor at the time of making the gift;

3. The time interval between the inter vivos transfer and death;

4. The existence of a desire to evade inheritance taxes;

5. Whether or not the inter vivos transfer was part of a testamentary scheme or plan;

---

[4] As an alternative to a disposition of a material part of the estate, the statute provides that a transfer in the nature of a final disposition can satisfy this third element as well. N.J.S.A. 54:34-1.

-13-

6. Past history of substantial gifts by the donor;

7. Whether or not the gift was made to the natural objects of the donor's bounty; and

8. Whether or not there existed an emergency situation which may have prompted the donation (e.g. donee's illness requiring large expenditures).

Id. at 70.

"The task of the fact finder is to carefully consider and weigh all of the surrounding circumstances shedding light on the decedent's intent, bearing in mind that quite often the only available witnesses are interested parties." Ibid. The Supreme Court expanded upon this concept in Lichtenstein by indicating that "[w]hether a particular transfer is, in substance, a substitute for a testamentary disposition depends on the subjective state of mind of the transferor at the time - - his intent or motivation in making the transfer. This is a question of fact, as to which the taxpayer bears the burden of persuasion, to be determined through reconstruction of that state of mind as best one can through objective indicia, always having in mind that taxation is a practical matter and never losing sight of common understanding and experience." 52 N.J. at 569. These words of caution were applied by the Supreme Court when it noted that the affidavits in Lichtenstein suffer from a certain degree of incompleteness, equivocation and conclusory statements with a partisan slant. Id. at 571.

Moreover, there may be more than one reason for making the gift. Thus, "irrespective of the existence of any life associated motives, it is sufficient to create a gift in contemplation of death if an impelling motive exists to make a present disposition in lieu of a testamentary disposition." Swain, 28 N.J. at 69. "The act was aimed equally at preventing the evasion of inheritance taxes and at assuring an equality of the incidence of the tax burden." Ibid. "Common understanding and experience are the touchstones for the interpretation of the revenue laws." Id. at 70.

In reaching a decision, the court must consider the factors in the aggregate, not merely count up whether a majority of the factors are met. Upon analysis, some factors may weigh more heavily in some cases, or even not at all in other cases. It is left to the court to carefully balance the factors applying a healthy dose of common sense and practicality.

Both parties have moved for summary judgment. The presumptive period construct utilized here is especially amenable to a resolution on summary judgment. In Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528 (1995), the defendants appealed contending that the trial judge engaged in an improper weighing of the facts and refused to consider the reasonable inferences to be drawn in favor of the defendant. As oft-stated, summary judgment is designed to provide a prompt, businesslike and inexpensive method of disposing of any cause which a discriminating search of the merits in the pleadings, depositions and admissions on

file, together with the affidavits submitted on the motion do not present any genuine issue of material fact requiring disposition at trial. Id. at 530. The court is to engage in an analytical process to determine whether the evidence presents a sufficient disagreement to require a plenary trial or whether it is so one-sided that one party must prevail as a matter of law. Id. at 533.

"Of course, there is in this process a kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials. This process, however, is not the same kind of weighing that a factfinder (judge or jury) engages in when assessing the preponderance or credibility of evidence. On a motion for summary judgment the court must grant all the favorable inferences to the non-movant. But the ultimate factfinder may pick and choose inferences from the evidence to the extent that a miscarriage of justice under the law is not created." Id. at 536. The import of the Brill decision is summary judgment is granted "when the evidence is so one-sided that one party must prevail as a matter of law." Id. at 540.

The court is not weighing the credibility of the witnesses, but is instead sifting through the circumstances surrounding the disposition of the 5.1 million dollars to determine whether plaintiff can rebut the presumption it was made in contemplation of death. In this case, the decision to make the disposition was that of Ms. Chernowitz. She is no longer with us so that we may readily evaluate her state of mind as to why she made the disposition. Certainly the reasons for her disposition

go to her intent, which is obviously now impossible to ascertain directly from her. Instead, her state of mind has to be ascertained by reconstruction by means of objective indicia. Lichtenstein, 52 N.J. at 569; Meyerson, 15 N.J. Tax 128, 134 (Tax 1995); Berg, 17 N.J. Tax at 266. Moreover, the court cannot be ignorant of what "smacks essentially of an inter vivos substitute for a testamentary disposition . . . ." See Lichtenstein, 52 N.J. at 574. With the foregoing in mind, each of the Swain factors are to be evaluated.

**Factor 1: Age.**

The first factor is age. At the time Ms. Chernowitz made the 5.1 million dollar gift, she was ninety-eight years of age. On one hand, it must be remembered that advanced age is only one factor and that age standing alone is not conclusive. Berg, 17 N.J. Tax at 267. On the other hand, the courts have consistently ruled that transfers made within three years of death by persons over the age of eighty are made in contemplation of death. Ibid. (citing Meyerson, 15 N.J. Tax at 128 (ninety years old); Swain, 28 N.J. at 71 (eighty-seven years old); Cairns v. Martin, 130 N.J. Eq. 313, 314 (Prerog. Ct. 1941) (eighty-three years old)). Thus, while not conclusive, decedent's advanced age coupled with the transfer of a material part of her estate does not point toward overcoming the presumption. See Ibid.

**Factor 2: <u>General condition of health.</u>**

The next factor is the general condition of health of Ms. Chernowitz at the time of making the gift. The parties have spent much time and effort arguing over this point. The estate argues that Ms. Chernowitz fully recovered from her cancer and spent the day walking around Manhattan when she went to see her financial advisor to make the 5.1 million dollar transfer. On the other hand, the Director emphasizes that Ms. Chernowitz suffered from cancer and other health issues. The court does not and need not wander into the thicket of creditability, since the court is able to evaluate this factor in light of the undisputed material facts as to Ms. Chernowitz' health record coupled with all favorable inferences attributable to her quality of life.

It is undisputed that Ms. Chernowitz suffered from colon cancer and underwent a bowel resection which removed a tumor growing in her intestines that measured four centimeters by three centimeters by one centimeter. Afterwards, she continued to suffer from intermittent blood in her stool and anemia. It is further undisputed that Ms. Chernowitz was found lying on the floor in vomit and that she reported an episode of unexplained vomiting and weakness.

The estate asserts that Ms. Chernowitz was essentially in good health through the years and maintained a high quality of life. This is not surprising for someone who was lucky and fortunate enough to reach the ripe old age of ninety-eight and

still maintain what appeared to be a relatively active lifestyle, including being able to walk around Manhattan all day after making the 5.1 million dollar transfer. Despite her vitality and vigor, one cannot underestimate the cancer scare that she underwent and its ability to remind one of their own mortality.

The statutory language does not require that the transfers be made in contemplation of imminent death. Berg, 17 N.J. Tax at 267. While Ms. Chernowitz' cancer may not have resulted in her imminent death, and may never have resulted in her death, it served as a stark reminder that despite her excellent health, none of us can escape death. To reason otherwise would be losing sight of common understanding and experience. Lichtenstein, 52 N.J. at 569.

Furthermore, despite having many, many good years, Ms. Chernowitz not only faced a cancer scare, but had ongoing intermittent blood in her stool and anemia, was found lying on the floor in vomit in her apartment, and reported an episode of unexplained vomiting and weakness. Whether at the time of making the gift she was in good health or poor health is not the issue. Based upon the objective evidence of the cancer and other health maladies, the natural inference and conclusion is that Ms. Chernowitz was facing and had to confront her own mortality despite her continued vigor and vitality. As a result, this factor tends to be against the estate overcoming the presumption.

**Factor 3:  <u>Time interval between inter vivos transfer and death.</u>**

The next factor is the time interval between the <u>inter vivos</u> transfer and death. This factor seems almost circular, since one of the elements establishing the presumptive period is death within three years of the gift.  Despite the presumptive three year period, this factor is still relevant.  For example, a transfer which is made a few days before death may not be very helpful in overcoming the presumption, whereas a transfer at two years and eleven months prior may be in some circumstances.  Likewise, it is certainly possible that a transfer four years prior could still be in contemplation of death, absent the prohibition by the Legislature which deems transfers three years prior to not be in contemplation of death.  <u>See</u> N.J.S.A. 54:34-1.  Overall, while imminent death is not a requirement, many times death shortly after a disposition is telling.

The statutory presumption under consideration here is grounded in practicality, fairness and policy.  <u>Swain</u>, 28 N.J. at 67.  It was the policy decision of the Legislature to set the three year period.  Nevertheless, within that three year period, the court can still consider whether the time interval in a particular circumstance provides objective insight into discerning the subjective motivations of the decedent for making the gift.  Certainly a death bed gift made the days or

hours prior to death smacks more of an <u>inter vivos</u> testamentary disposition than a gift made years prior.

In this case, Ms. Chernowitz did not pass until some years later. Certainly, this is not a deathbed bequest and the court determines that the time interval here is a factor, but just one factor, favorable to the estate in overcoming the presumption. This does not by any means suggest that a disposition must be made in contemplation of imminent death to be in contemplation of death. <u>See</u> <u>Lichtenstein</u>, 52 N.J. at 467-68; <u>Berg</u>, 17 N.J. Tax at 267. In this case, the time interval of about a year between Ms. Chernowitz' cancer scare and the making of the gift is certainly more relevant and more probative of her intent than the time interval between the gift and her death. In other words, when it comes to rebutting the presumption, any ground gained by Ms. Chernowitz surviving two years after the gift is easily eroded by the gift being made relatively shortly after the cancer diagnosis that would serve to remind any reasonable person of their mortality.

**Factor 4: <u>Existence or desire to evade inheritance taxes.</u>**

As originally formulated by <u>Swain</u> in 1958, this factor only focused upon the existence or desire to evade inheritance taxes. 28 N.J. at 70. In the modern context, this factor includes not only inheritance taxes, but other taxes and liens such as those imposed by the federal estate tax and Medicaid.

In Berg, it was asserted that the funds were transferred in contemplation of life so that the decedent, then living, would qualify for Medicaid. 17 N.J. Tax at 268-69. This is not be confused with Medicare, which is paid for through the Medicare tax on wages and only covers skilled nursing facility care in full for twenty days.[5] 42 U.S.C. § 1395e(a)(3) (twenty days of full payment); 42 U.S.C. § 1395i(a) (Medicare trust fund); 26 U.S.C. §§ 3101(b), 3111(b) (wage tax to fund Medicare trust). Medicaid is paid through general revenues (i.e., income taxes, etc.) and covers nursing home care beyond twenty days. 42 U.S.C. § 1396-1 (appropriations from general revenues); 42 U.S.C. § 1396d(a) (nursing home coverage). However, since Medicaid is considered a general welfare program, those with certain types of assets of over two thousand dollars are not eligible for Medicaid and have to use their own funds until their assets are depleted below the two thousand dollar level.[6] N.J.A.C. 10:71-4.5(c). The court determined that the divestiture of the decedent's estate for Medicaid purposes is not a life-associated motivation. Berg, 17 N.J. Tax at 269. Such action indicates an intent to preserve the decedent's assets and estate for the heirs and clearly constitutes a testamentary disposition. Ibid.

---

[5] After twenty days, Medicare will cover skilled nursing facility care for an additional eighty days with a daily co-payment of $170.50 for 2019. 83 Fed. Reg. 52461 (Oct. 17, 2018).

[6] Medicaid provides a look back period for transfers that are made within five years of attempting to qualify for Medicaid in order to avoid a divestiture of assets shortly before application for Medicaid. 42 U.S.C. § 1396p(c)(1)(B)(i).

The same Medicaid issue arose in <u>Estate of Muscle v. Dir., Div. of Tax'n.</u>, 26 N.J. Tax 192 (Tax 2011) and the court once again determined that the intent was to preserve the decedent's assets and estate for the heirs and clearly constitutes a testamentary disposition. <u>Id.</u> at 210. Simply stated, many times when the issue is when to make the gifts versus whether to make the gifts, the gifts are in contemplation of death. <u>Berg</u>, 17 N.J. Tax at 269, <u>Makris</u>, 4 N.J. Tax at 144, <u>Muscle</u>, 26 N.J. Tax at 207.

In 2013, the lifetime estate and gift tax exclusion was to revert to 1 million dollars from 5.12 million dollars. <u>Supra</u> at n. 1. In other words, 2012 was the last year to make a gift utilizing the 5.12 million dollar exclusion. Ms. Chernowitz had not executed a will since 2001 when she executed a reciprocal will with her husband. The will provided that the rest, residue and remainder of her estate was to go to her husband, George Chernowitz. In the event that her husband predeceased Ms. Chernowitz, her will provided Richard was to get $500,000 in cash and that the rest, residue and remainder would go to charity. Her husband's will had identical provisions. It is not fully clear from the record the size of the residual estate at the time the reciprocal wills were executed. Moreover, it is unclear from the record whether Ms. Chernowitz or her husband George was the driving force behind the will provisions. This was especially true as to the provisions dealing with the rest, residue and remainder going to charity.

Ms. Chernowitz' husband passed in 2002. Richard indicated Ms. Chernowitz was a stickler for detail and extremely meticulous and that she never ended up revising her will because she got so far "into the weeds" with things. She wrote it over and over again, and it was hard for her to accomplish things. Nevertheless, the December 31, 2012 deadline for making a gift was looming. See supra at n. 1. It is unclear how she obtained the knowledge of the exclusion and its impending reduction, whether it was from her financial advisor, extensive reading of the New York Times and Wall Street Journal, or from some other source. However, it should be noted that she did have some prior knowledge of avoiding the gift tax, since she made previous gifts to Richard's brother Stuart's trust, in amounts that were just under the gift tax annual exclusion amounts for 2006 through 2011. Ms. Chernowitz seemed to be acutely aware of the tax implications of her financial affairs and had extensive investments in tax-free municipal bonds. In fact, the vast majority of her income of $882,000 per year was derived from such bonds. Over the years, Ms. Chernowitz' actions demonstrate a concerted effort to avoid taxes.

Richard indicated that Ms. Chernowitz notified him that she was considering revising her will and asked if he knew any estate planning attorneys. He recommended Robert A. Bacine, Esquire, who had represented him for some twenty to twenty-five years. Mr. Bacine's notes list a number of writings including a will, POA (likely designating power of attorney), and an HC (likely designating health

care) directive. He reviewed her will when he met with Ms. Chernowitz. Her understanding was that a one-time 5 million dollar gift would provide a potential federal estate tax savings of 2 million dollars. Under federal law, the estate and gift tax are unified so that the lifetime exclusion applies to both gifts inter vivos as well as testamentary dispositions through the estate. Supra at n. 1. Just like protecting an estate from nursing home costs, that 2 million dollar tax savings would mean that her estate would be that much larger at death.

The estate points out that Ms. Chernowitz had an existing will which only gave Richard $500,000. However, that was a spousal reciprocal will that was over a decade old, and the extent of the influence of her husband George in setting the terms is unknown. Moreover, at the time of the will, her husband was still alive and she was not living nearby Richard and his family. Apparently, there was significant upheaval in Ms. Chernowitz' life from the time she executed the original will and the time of the gift. Her husband had passed, and she had moved many miles to be closer to Richard.

"[I]t is human nature that people do not generally divest themselves of a major portion of their estates except as a substitute for testamentary disposition and in contemplation of death." Berg, 17 N.J. Tax at 267. Except for the relatively small gifts below the annual gift tax exclusion amount made to Stuart's trust from 2006 through 2011, there is not any documented history of significant gifts to her family

or anyone else. Moreover, there is not any evidence that Ms. Chernowitz desired the Jacoby's to enjoy the gift during her lifetime. To the contrary, a significant amount of the assets were placed in trust. Even if she somehow thought that they could enjoy it during her lifetime, the law provides that there can be more than one motive for making the transfer, some of which are associated with life and others in contemplation of death. It is not necessary that the thought of death be a controlling motive for the transfer. Id. at 268. "[I]rrespective of the existence of any life associated motives, it is sufficient to create a gift in contemplation of death if an impelling motive exists to make a present disposition in lieu of a testamentary disposition." Lichtenstein, 52 N.J. at 569.

Certainly, in this case there was an impelling motive to make the disposition in 2012 rather than waiting to a later date. The tax code was changing, and it was changing soon, with significant effects. Ms. Chernowitz, despite being meticulous and getting bogged down "into the weeds," had to make a decision. If she did not make the gift in 2012 and waited, there could be significant tax consequences. Ms. Chernowitz was savvy as to tax consequences, as demonstrated by her financial decisions to almost exclusively invest in tax-free municipal bonds and garner $798,000 in tax-free income each year. Moreover, for the contributions that were made to Stuart's special needs trust, she limited those contributions to the annual gift tax exclusion for each year. If anything, she was keen to avoid taxes. The objective

evidence here points to a sophisticated investor, an individual who was determined to make the transfers in 2012, instead of at death, in order to avoid significant estate taxes. It must be remembered she asked Richard for an estate attorney. Her gift falls well within the rubric of gifts in which the decedent is more concerned with when to make the gift to a certain donee, not whether to make the gift. <u>Berg</u>, 17 N.J. Tax at 269. As such, this factor does not help plaintiff overcome the presumption.

**Factor 5:** <u>**Whether or not the <u>inter vivos</u> transfer was part of a testamentary scheme or plan.**</u>

The issues as to this factor are partially addressed in the prior factor concerning the desire to avoid inheritance taxes.

This single factor looks at whether the transfer is part of a testamentary <u>scheme</u>, and is not to be confused with the overall review of whether the transfer is part of a testamentary <u>disposition</u>. The court examines in a more literal sense whether the transfer is a substitute for a testamentary scheme or plan that is already in place.

For example, in <u>Swain</u>, the initial will left a residuary estate in equal shares to the daughter and the daughter-in-law. 28 N.J. at 72. Then, <u>inter vivos</u> transfers were made of $36,540 to the daughter and her family, and $6,090 to the daughter-in-law and her family. <u>Ibid.</u> Shortly after these transfers, Swain directed that a new will be drawn in which she provided for a general legacy of $30,000 to her daughter-in-law, the residue to be shared equally between the daughter and the daughter-in-law. <u>Ibid.</u>

-27-

Thus, the Court determined that "it can be readily seen that the $30,000 general legacy to the daughter-in-law was intended to equalize the distribution of the estate . . . ." Id. at 72-73.

In this case, there was a prior reciprocal will between Ms. Chernowitz and her husband. It is unclear from the record as to whether Ms. Chernowitz or her husband was the driving force behind the will provisions. While the will only provided Richard with about ten percent of the amount he later received through the inter vivos gift, this will predates the death of her husband and her move closer to Richard and his family.

This factor leans toward overcoming the presumption. However, the circumstances of Ms. Chernowitz' life were vastly different when she executed the will some years prior to her making the inter vivos transfer which makes this factor have limited value in overcoming the presumption.

**Factor 6:  <u>Past history of substantial gifts by the donor.</u>**

The donor here does not have any history of substantial gifts. Thus, for the transfers to Richard and his family, this factor is against overcoming the presumption.

However, as to Stuart and the $300,000 he received, the story is somewhat different. From 2006 through 2011, Ms. Chernowitz made gifts of $11,500 to $12,500 per year to his special needs trust. The amount of these gifts were ostensibly

tied to the annual gift tax exclusion. It could be argued that the gift of $300,000 to Stuart's special needs trust is not so wide of the mark to be considered an <u>inter vivos</u> transfer. On the other hand, she could have continued to make those $11,500 to $12,500 gifts (which are below the annual exclusion amount) each year for the next twenty-five years or so if she realistically expected to live that long. The annual exclusion amount does not count against the lifetime exclusion. <u>See</u> <u>supra</u> at n. 2. Giving more to Stuart's trust demonstrates that it was done in contemplation of death. Moreover, Ms. Chernowitz' overall history of gifts evidences that she was attempting to avoid taxation.

> **Factor 7: <u>Whether or not the gifts were made to natural objects of the donor's bounty.</u>**

Ms. Chernowitz did not have any children. She did have nieces and nephews, and she was especially close to Richard and moved closer to him upon death of her husband. Richard and his family are indeed natural objects of her bounty. Therefore, this factor is against overcoming the presumption.

> **Factor 8: <u>Whether or not there existed any emergency situation which may have prompted the donation, such as an illness, requiring large expenditures.</u>**

A determination of whether a gift was made to help in an emergency situation takes into consideration whether the decedent planned to make the gift rather than when the gift is going to be made. Certainly a change in the tax code does not constitute an emergency situation to prompt a donation. Rather, it is merely an effort

to avoid the estate tax that would be imposed if the transfer was otherwise made to Richard and his family at the time of death.

Gifts made for emergency situations are usually considered to be made in contemplation of life. Here, there has not been any life-associated motivation set forth. The estate has the burden. Thus, this factor does not help overcome the presumption.

### D. Overall analysis of the factors

As stated, the court cannot consider any one factor in a vacuum, and must consider all the factors together, and in their totality. The court does not have to evenly balance each factor. An evaluation, analysis and sifting of the circumstances dictates the appropriate weight to be given each factor in terms of how it figures into the efforts of a taxpayer to overcome the presumption. Brill, 142 N.J. at 536. However, the court is not weighing credibility, but gives the estate all favorable inferences. Ibid.

The age of decedent is against overcoming the contemplation of death presumption. Moreover, while Ms. Chernowitz may or may not have been in good health, the undisputed fact is that she faced a bout of cancer, continued to have intermittent blood in her stool and anemia, and was found lying on the floor in vomit in her apartment. As already stated in more detail, the factor concerning health goes against overcoming the presumption. The two year interval between the gift and her

death is in favor of overcoming the presumption, but not so much so as to offset her cancer scare.

The existence or desire to avoid estate taxes is demonstrated by Ms. Chernowitz' careful tax planning over the years which resulted in a large portfolio of tax-free municipal bonds and limiting gifts to Stuart's trust to below the annual gift tax exclusion. Sifting through the actions of Ms. Chernowitz does not demonstrate that this factor helps the estate overcome the presumption.

There is not any direct link of the transfers to a prior testamentary scheme. Without this link, this factor favors overcoming the presumption. On the other hand, there is not any history of prior gifts, save the gifts to Stuart's trust. This factor is against overcoming the presumption and has a tendency to cancel out the factor pertaining to the inter vivos transfer lacking a link to a prior testamentary scheme.

It is undisputed that Richard and his family are natural objects of Ms. Chernowitz' bounty, which is against overcoming the presumption. Finally, there was not any emergency reason for making the gift which also is against overcoming the presumption.

Having had the opportunity to examine all the factors in their totality and together, and while giving all favorable inferences to the estate, there is simply

insufficient objective evidence for a reasonable factfinder to determine the presumption has been overcome.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, defendant's cross-motion is granted and plaintiff's motion is denied.  The matter is dismissed.